JENNIFER LEE TAYLOR (SBN 161368)
JTaylor@mofo.com
STACEY M. SPRENKEL (SBN 241689)
SSprenkel@mofo.com
JOYCE LIOU (SBN 277720)
JLiou@mofo.com
AMANDA D. PHILLIPS (SBN 305614)
APhillips@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone:     (415) 268-7000
Facsimile:     (415) 268-7522

*Attorneys for Defendants*
UBIQUITI NETWORKS, INC. and
CHING-HAN TSAI

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| SYNOPSYS, INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>UBIQUITI NETWORKS, INC., UBIQUITI NETWORKS INTERNATIONAL LIMITED, CHING-HAN TSAI, and DOES 1-20, inclusive<br><br>                    Defendants. | Case No. 5:17-cv-00561-WHO<br><br>**DEFENDANTS UBIQUITI NETWORKS, INC. AND CHING-HAN TSAI'S REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S SECOND, THIRD, FOURTH, FIFTH, SIXTH, AND SEVENTH CLAIMS PURSUANT TO RULE 12(b)(6)**<br><br>Date: May 17, 2017<br>Time: 2:00 p.m.<br>Place: Courtroom 2, 17th Floor<br>Judge: Honorable William H. Orrick |
| UBIQUITI NETWORKS, INC.,<br><br>                    Counterclaimant,<br><br>          v.<br><br>SYNOPSYS, INC.,<br><br>                    Counterdefendant. | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................................... 1

ARGUMENT .............................................................................................................................. 1

I.     PLAINTIFF'S SECOND AND THIRD CLAIMS FAIL TO STATE CLAIMS ............... 1

II.    PLAINTIFF'S FOURTH CLAIM FAILS TO STATE A CLAIM .................................... 3

III.   PLAINTIFF'S SIXTH CLAIM FAILS TO STATE A CLAIM ........................................ 6

     A.    Plaintiff Fails to Plead a Predicate Act .................................................................. 6

          1.    Plaintiff Fails to State a Claim in Connection with Access Devices .......... 6

          2.    Plaintiff Fails to State a Claim for Criminal Copyright Infringement ........ 8

          3.    Plaintiff Fails to State a Claim for Wire Fraud ......................................... 10

     B.    Plaintiff's 1962(c) RICO Claim Fails for Additional Reasons ............................. 12

IV.   PLAINTIFF HAS NOT STATED A CLAIM FOR RICO CONSPIRACY .................... 14

V.    PLAINTIFF'S FIFTH AND SEVENTH CLAIMS FAIL TO STATE CLAIMS ............ 15

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ass'n for Info. Media & Equip. v. Regents of the Univ. of Cal.,*
2012 WL 7683452 (C.D. Cal. Nov. 20, 2012)...............................................................2

*Bryant v. Mattel, Inc.,*
573 F. Supp. 2d 1254 (C.D. Cal. 2007) ........................................................................9

*Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.,*
637 F.3d 1047, 1055 (9th Cir. 2011)..........................................................................10

*Carlson v. U.S. Postal Serv.,*
504 F.3d 1123 (9th Cir. 2007)................................................................................2, 3

*CoStar Realty Info., Inc. v. Field,*
612 F. Supp. 2d 660 (D. Md. 2009) .............................................................................8

*Fitzgerald v. Chrysler Corp.,*
116 F.3d 225 (7th Cir. 1997)......................................................................................14

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.,*
772 F.2d 505 (9th Cir. 1985)..................................................................................9, 10

*Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.,*
2013 WL 3943267 (S.D.N.Y. July 31, 2013) ...............................................................8

*Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.,*
23 F. Supp. 3d 173 (S.D.N.Y. 2014)............................................................................9

*Heppner v. Alyeska Pipeline Serv. Co.,*
665 F.2d 868 (9th Cir. 1981).......................................................................................8

*H.J., Inc. v. Nw. Bell Tel. Co.*
492 U.S. 229, 245 (1989) ............................................................................................8

*Hung Lin Wu v. Mukasey,*
288 F. App'x 428 (9th Cir. 2008) .............................................................................3, 5

*Ice Cream Distribs. Of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.,*
2010 WL 3619884 (N.D. Cal. Sept. 10, 2010) ..........................................................14

*Kaczmarek v. Int'l Bus. Machs. Corp.,*
30 F. Supp. 2d 626 (S.D.N.Y. 1998)..........................................................................14

*Kuhali v. Reno,*
266 F.3d 93 (2d Cir. 2001).........................................................................................2

CASE NO. 5:17-CV-00561-WHO
UBIQUITI NETWORKS, INC. AND CHING-HAN TSAI'S REPLY IN SUPPORT OF RULE 12(B)(6) MOTION TO DISMISS

ii

**TABLE OF AUTHORITIES**
(continued)

Page

*Lopez v. Gonzales*,
   549 U.S. 47 (2006) ........................................................................................................2

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
   629 F.3d 928 (9th Cir. 2010)..........................................................................................9

*Microsoft Corp. v. # 9 Software, Inc.*,
   2005 WL 3447965 (E.D. Va. Dec. 15, 2005) .................................................................5

*Microsoft Corp. v. A Plus Open LLC*,
   2007 WL 437776 (D. Colo. Feb. 6, 2007) .....................................................................5

*Microsoft Corp. v. Ion Techs. Corp.*,
   484 F. Supp. 2d 955 (D. Minn. 2007) ............................................................................6

*Microsoft Corp. v. Pronet Cyber Techs., Inc.*,
   593 F. Supp. 2d 876 (E.D. Va. 2009).........................................................................4, 6

*Neder v. U.S.*,
   527 U.S. 1 (1999)..........................................................................................................10

*NSI Techs. v. NASA*,
   1996 U.S. Dist. LEXIS 22455 (N.D. Cal. May 13, 1996) ...........................................13

*Parfums Givenchy, Inc. v. C & C Beauty Sales, Inc.*,
   832 F. Supp. 1378 (C.D. Cal. 1993)...............................................................................1

*Peter Rosenbaum Photography Corp. v. Otto Doosan Mail Order, Ltd.*,
   2005 WL 2387687 (N.D. Ill. Sept. 26, 2005) ................................................................9

*Robert Kubicek Architects & Assocs. Inc. v. Bosley*,
   2012 WL 3149348 (D. Ariz. Aug. 1, 2012) ...................................................................8

*Smith v. Ayres*,
   845 F.2d 1360 (5th Cir. 1988).......................................................................................12

*St. Paul Fire & Marine Ins. Co. v. Lago Canyon, Inc.*,
   2009 WL 4855484 (S.D. Fla. Dec. 9, 2009) ..................................................................1

*Steward v. West*,
   2013 WL 12120232 (C.D. Cal. Sept. 6, 2013)...............................................................8

*Stewart v. Wachowski*,
   2005 WL 6184235 (C.D. Cal. June 14, 2005) ................................................................8

**TABLE OF AUTHORITIES**
(continued)

Page

*Sussex Financial Enterprises v. Bayerische Hypo-Und Vereinsbank AG,*
2010 WL 94272 (Jan. 6, 2010) ................................................................11

*Synapsis v. Evergreen Data Systems*
2006 WL 44239 (N.D. Cal. Jan. 9, 2006) ................................................10

*Synopsys, Inc. v. ATopTech, Inc.,*
2013 WL 5770542 (N.D. Cal. Oct. 24, 2013) ...........................................9

*Tabas v. Tabas,*
47 F.3d 1280 (3d Cir. 1995) ....................................................................13

*United Energy Owners Committee v. United States Energy Mgmt.,*
837 F.2d 356 (9th Cir. 1988) ...................................................................14

*U.S. v. Abozid,*
257 F.3d 191 (2d Cir. 2001) ................................................................6, 7

*U.S. v. Bailey,*
41 F.3d 413 (9th Cir. 1994) ..................................................................6, 7

*U.S. v. Bao,*
189 F.3d 860 (9th Cir. 1999) .....................................................................4

*U.S. v. Blinder,*
10 F.3d 1468 (9th Cir. 1993) ...................................................................14

*U.S. v. Bruce,*
531 F. Supp. 2d 983 (N.D. Ill. 2008) ........................................................7

*U.S. v. Habegger,*
370 F.3d 441 (4th Cir. 2004) .....................................................................3

*U.S. v. Koehler,*
24 F.3d 867 (6th Cir. 1994) .......................................................................3

*U.S. v. Lutz,*
2008 WL 4449082 (N.D. Ohio Sept. 30, 2008) ........................................7

*U.S. v. Peterson,*
98 F.3d 502 (9th Cir. 1996) .......................................................................7

*U.S. v. Philip Morris USA,*
566 F.3d 1095 (D.C. Cir. 2009) ...............................................................13

CASE No. 5:17-CV-00561-WHO
UBIQUITI NETWORKS, INC. AND CHING-HAN TSAI'S REPLY IN SUPPORT OF RULE 12(B)(6) MOTION TO DISMISS\

iv

# TABLE OF AUTHORITIES
## (continued)

Page

*U.S. v. Sepulveda*,
115 F.3d 882 (11th Cir. 1997) ............................................................................... 7

*U.S. v. Woods*,
335 F.3d 993 (9th Cir. 2003) ............................................................................... 11

*Univ. City Studios, Inc. v. Reimerdes*,
111 F. Supp. 2d 294 (S.D.N.Y. 2000) ................................................................... 2

*Wang v. Rodriguez*,
830 F.3d 958 (9th Cir. 2016) ................................................................................ 5

*Webster v. Omnitrition Int'l, Inc.*,
79 F.3d 776 (9th Cir. 1996) ................................................................................ 14

**Statutes**

18 U.S.C. § 1029 ............................................................................................... 6, 8

18 U.S.C. § 2318 ............................................................................................... 3, 6

18 U.S.C. § 2320 ................................................................................................... 3

**Other Authorities**

Joseph, Gregory P., Civil RICO: A Definitive Guide 41 (4th ed. 2015) ......................... 14

Melville B. Nimmer and David Nimmer, 5 *Nimmer on Copyright* § 15.05 ...................... 8

S. Rep. No. 97-274 (1981) ............................................................................ 3, 4, 5

Case No. 5:17-CV-00561-WHO
Ubiquiti Networks, Inc. and Ching-Han Tsai's Reply in Support of Rule 12(b)(6) Motion to Dismiss\

v

**INTRODUCTION**

The fundamental purpose of a pleading is to put a party on notice of plausible claims against it.  The complaint fails to do so.  Synopsys' opposition only adds to the confusion, making inconsistent arguments, quoting elements of claims without identifying facts, and confusing legal concepts.  Remarkably, it is still unclear which claim was brought against which defendant. [1]

**ARGUMENT**

**I.     PLAINTIFF'S SECOND AND THIRD CLAIMS FAIL TO STATE CLAIMS**

*Import.*  Synopsys claims it pled that Defendants "imported" circumvention tools by "transmitting" them "from Taiwan to the United States."  (Opp. at 5.)  There are two issues with this claim.  First, Synopsys' citations do not support this statement.  Second, the acts in the cited paragraphs, namely, allegedly "remotely access[ing]" counterfeit keys (ECF No. 27 ("FAC") ¶¶ 58-59), are not "importing."  *See, e.g.*, *Parfums Givenchy, Inc. v. C & C Beauty Sales, Inc.*, 832 F. Supp. 1378, 1391 (C.D. Cal. 1993) (defining infringing importation under Copyright Act as "bringing goods and merchandise into a country from a foreign country") (citation omitted).

*Manufacture.*  Synopsys alleges that Defendants "manufactured" circumvention devices by "creating counterfeit license keys" (Opp. at 5), but it also admits that its "keys" are merely "human readable alphanumeric text elements," i.e. strings of letters and numbers.  (*Id.* at 9 n.8.)  Even if Defendants created such keys, it could not be considered manufacturing under any stretch of the imagination.  *See, e.g.*, *St. Paul Fire & Marine Ins. Co. v. Lago Canyon, Inc.*, 2009 WL 4855484, at *6 n.9 (S.D. Fla. Dec. 9, 2009) (relying on dictionary definition of manufacture as "[t]o make or process (a raw material) into a finished product, esp. by means of a large-scale industrial operation. b. To make or process (a product), esp. with the use of industrial machines. 2. To create, produce, or turn out in a mechanical manner. 3. To concoct or invent; fabricate").

*Traffic.*  Synopsys claims only that Defendants allegedly distributed circumvention technology "from corporation to corporation in furtherance of commercial objectives."  (Opp.

---

[1] As noted in the motion, all claims save the RICO claim were brought only against the "Piracy Enterprise," which does not include Ubiquiti or UNIL.  (ECF No. 34 ("Mot.") at 3.)  Synopsys claims that Defendants' position is "baseless," but does not cite to a single instance in the complaint where it alleged that Ubiquiti and UNIL are members of the "Piracy Enterprise."  (ECF No. 40 ("Opp.") at 11 n.9.)

at 5.)  This is not sufficient for two reasons.  First, the alleged conduct does not constitute "trafficking" under any credible reading of that word.  *See Univ. City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 325 (S.D.N.Y. 2000) ("To 'traffic' in something is to engage in dealings in it."); *Kuhali v. Reno*, 266 F.3d 93, 107-08 (2d Cir. 2001) (finding definition of "trafficking" that is limited to business or merchant setting comports with ordinary meaning).  Second, Synopsys has not alleged any facts to support its claim that Defendants acted "in furtherance of commercial objectives."  *See Carlson v. U.S. Postal Serv.*, 504 F.3d 1123, 1128-29 (9th Cir. 2007) ("commercial" defined as engaging in or relating to commerce, trade, or work intended for the mass market); *see also Lopez v. Gonzales*, 549 U.S. 47, 53-55 (2006) (finding no trafficking where commerce "was no part" of the defendant's "helping someone else to possess" illicit drugs, as such an interpretation would "often turn simple possession into trafficking").  Synopsys attempts here to do precisely what the Supreme Court in *Lopez* warned of in the context of drug possession, turning an act of circumvention into a claim for trafficking, "just what the English language counsels not to expect."  *See id.* at 48.

 *Provide*.  Synopsys claims that Defendants "provided" circumvention devices "to one another" (Opp. at 5), but, as made clear in the motion, the devices must be provided to "the public" and not amongst the parties.  (Mot. at 5.)  Synopsys dismisses this as "Defendants' illusory requirement," but the decision in *Ass'n for Info. Media & Equip. v. Regents of the Univ. of Cal.*, cited by Defendants, is clear: "The SAC does allege that Defendants have *provided* the Video Furnace software to professors, *but* the Court finds that these professors are *not* members of the public for purposes of this Court's DMCA analysis."  2012 WL 7683452, at *9 (C.D. Cal. Nov. 20, 2012) (emphasis added).  Plaintiff has also not alleged that Defendants "provided" circumvention devices for the reasons set forth above.  *See Univ. City Studios*, 111 F. Supp. 2d at 325 (finding that "or otherwise traffic in" gives meaning to the word "provide").

 Finally, with respect to its § 1201(b)(1) claim, Synopsys claims that its license key system protects its "reproduction" right (Opp. at 6-7), but provides no fact citation for this—because the complaint has no such allegation.  Accordingly, this argument need not be considered.

## II.      PLAINTIFF'S FOURTH CLAIM FAILS TO STATE A TRAFFICKING CLAIM

*Trafficking*.  Just as Defendants have not "trafficked" keys in any ordinary sense of the term, Defendants have not "trafficked" keys within the meaning of that term under 18 U.S.C. § 2318.  To "traffic" requires one to commit, or intend to commit, some act of disposal (a) to *another*, for (b) *purposes* of financial gain or commercial advantage.  18 U.S.C. § 2320(f)(5) (emphasis added).  Synopsys claims that Defendants' actions were for financial gain or commercial purposes, but all it has alleged is that Defendants acted with a "common purpose" to lower development costs and to "reap ill-gotten profits" from accessing Synopsys software. (FAC ¶ 29.)  This allegation, which makes little sense as is, cannot state a plausible § 2318 claim.

First, even if Defendants allegedly shared keys with one another for a "common purpose," Synopsys has not shown that any Defendant acted for financial gain.  The term "financial gain" includes the receipt, or expected receipt, of anything of value.  18 U.S.C. § 2320(f)(2); *accord Hung Lin Wu v. Mukasey*, 288 F. App'x 428, 430 (9th Cir. 2008) ("[T]he act of trafficking [under § 2318] is done necessarily 'to gain something of value.'") (citation omitted).  Consideration is an integral element to an act of trafficking for "financial gain."  *See U.S. v. Habegger*, 370 F.3d 441, 444 (4th Cir. 2004) (sending of sample counterfeit socks for which recipient had not promised anything in return did not satisfy definition of "traffic"); *cf. U.S. v. Koehler*, 24 F.3d 867, 871 (6th Cir. 1994) (recipient's supply of counterfeit goods in exchange for counterfeit labels constituted receipt of "anything of value").  Here, Synopsys has not shown that Defendants received or expected to receive anything *from* each other in *return* for the exchanged keys.  Nor has Synopsys explained how a cost-saving motive is an act for "financial gain" under § 2318.

Second, Synopsys has not alleged that Defendants distributed keys for a commercial advantage—i.e. for commerce or trade.  *See Carlson*, 504 F.3d at 1129 (noting common definitions of "commercial").  Rather, Synopsys' allegations underscore a key fact: Defendants are merely alleged to be Synopsys software *users*.  Even if Defendants earned some cost-saving from using such keys, this does not establish a commercial advantage vis-à-vis anyone else. Moreover, use and possession are not actionable under the statute.  *See* S. Rep. No. 97-274, at 9 (1981) (trafficking intentionally "exclude[s] those who knowingly acquire counterfeit articles

1   solely for personal use").  Synopsys does not cite any § 2318 case for the outcome it seeks here—

2   that a user should be liable for "trafficking" merely for sharing keys for others' personal use.

3       While Synopsys claims that Defendants committed other (implausible) acts—making,

4   importing, or exporting—that do not require the involvement of a third party, trafficking still

5   requires the acts be committed with the *intent* to dispose of, to another, for purposes of financial

6   gain or commercial advantage.  None of the cases cited by Synopsys avoids this requirement, and

7   *all* involved a defendant in the business of transporting or producing labels for the purpose of

8   eventual sale, which is not this case.[2]  These cases only sharpen the claim's fatal shortcomings.

9       ***Defendants have not trafficked "counterfeit" labels.***  Synopsys falsely states that it is

10  "well settled that software authentication keys such as the *Synopsys* license keys" qualify as

11  "identifying labels" for purposes of § 2318.  (Opp. at 7.)  This statement, which Synopsys bases

12  on a line of *Microsoft* cases involving counterfeit CD-ROM software copies, is misleading on two

13  levels.  First, unlike Microsoft, Synopsys does not market or sell its software to customers on

14  physical "computer media" with various labels "affixed to the program's packaging."  *Cf.*

15  *Microsoft Corp. v. Pronet Cyber Techs., Inc.*, 593 F. Supp. 2d 876, 878 (E.D. Va. 2009).

16  Synopsys transfers its software directly "to licensees over the Internet via a secured file transfer

17  protocol."  (FAC ¶ 95.)  Second, Microsoft affixes physical labels to CD packaging that display a

18  product key, and, in some cases, a certificate of authenticity (COA), which contains "difficult-to-

19  reproduce security features and which help[s] users identify genuine Microsoft products," on the

20  same label as the key.  *Pronet*, 593 F. Supp. 2d at 878.  In contrast, Synopsys emails its product

21  "key files" to its licensees.  (*See* Opp. at 7.)

22      Despite the general functional similarity of software keys, no court has found that the

23  *electronic* keys offered by Synopsys are "identifying labels" under § 2318.[3]  And this Court

24  _____

25  [2] In addition, Synopsys miscites *United States v. Bao*, 189 F.3d 860 (9th Cir. 1999), for both its
    holding and the proposition that a defendant may be liable for trafficking labels to co-
26  conspirators.  In fact, the *Bao* defendant was convicted of printing counterfeit manuals (which the
    defendant admitted to knowing was illegal), not selling manuals to a co-conspirator (though he
    did that as well).  *Id.* at 863.
27  [3] The issue is not whether the keys accompany or work with specific copies of Synopsys
    software, which Synopsys focuses on, but whether the keys serve as "identifying labels" for
28  copies of the software.

1   should not.  Synopsys has not shown that Synopsys' separate key files, like Microsoft's stickers

2   affixed to physical packaging, serve as "identifying labels" to identify copies of the underlying

3   software to consumers.[4]  Users only receive licensed software directly *from* Synopsys.  (FAC ¶

4   95.)  With respect to electronic keys, Synopsys alleges that its license keys, which enable access

5   to the software, are separately sent by Synopsys to licensees (*id.* ¶ 26) in "standalone" emails

6   (Opp. at 9), in contrast with "counterfeit" keys obtained from "hacker websites" (FAC ¶ 28).

7   These allegations make clear that electronic keys are functional rather than an "identifying label"

8   (as they are completely unrelated to the software transmission), and that a user will always know

9   if he or she is getting a genuine key or not by its source.

10        Synopsys also has not plausibly alleged that Defendants knowingly trafficked in

11   "counterfeit" labels—i.e. labels that appeared genuine to third parties but were not.  Contrary to

12   Synopsys' assertion, "counterfeit labels are by definition false representations" and only a person

13   who is "knowingly *passing off* counterfeit material as real" to others is a trafficker under § 2318.

14   *See Hung Lin Wu*, 288 F. App'x at 430 (emphasis added).  Synopsys cites several inapposite

15   cases that do not involve counterfeit labels.[5]  Recognizing the deficiency with its allegations,

16   Synopsys offers certain proposed amendments, but these will not cure the claim.  Rather, they

17   raise the claim to even more implausible heights: Defendants cannot be both the alleged

18   conspirators who trafficked "counterfeit" keys to each other (*e.g.*, FAC ¶¶ 58, 99), *and* the

19   "innocent reader[s]" deceived into believing keys are "genuine" (Opp. at n.8.)

20        ***Defendants have not trafficked "illicit" labels.***  Synopsys concedes that it has not

---

[4] The statute does not define "label," but legislative history shows that Congress construed "counterfeit" goods as products marketed as a legitimate product, and "counterfeit labels" as components of a product "package," or "graphics being forgeries or close facsimiles of those of the authentic product."  *See* S. Rep. No. 97-274, at 5, 9.  Synopsys argues that its key files are functionally "part of the software package," but this confuses the term "package" for a product's functional elements, not features that serve to *identify* a product to consumers. (*See* Opp. at 9.) The latter is what Congress meant by a "label."

[5] *Wang v. Rodriguez*, 830 F.3d 958 (9th Cir. 2016), is unavailing because the court addressed the "post-sale confusion" doctrine unique to the confusion requirement in § 2320, which does not exist under § 2318.  In *Microsoft Corp. v. # 9 Software, Inc.*, 2005 WL 3447965 (E.D. Va. Dec. 15, 2005), the only trafficking at issue was defendant's distribution of "illicit" labels (genuine but misused Microsoft COAs), not "counterfeit" labels that appeared genuine but were not. Likewise, *Microsoft Corp. v. A Plus Open LLC*, 2007 WL 437776 (D. Colo. Feb. 6, 2007), involved illicit labels.

1   adequately alleged that Defendants trafficked "illicit" labels meant for other Ubiquiti locations as

2   it never addresses this point.  It now tries to claim that Defendants used genuine license keys in

3   connection with *unauthorized* copies of software (Opp. at 10), but this is not pled in the

4   complaint.  Further, *using* genuine keys is not trafficking.  Synopsys also has not sufficiently pled

5   *how* its license keys verify that a copy of Synopsys software "is not counterfeit or infringing of

6   any copyright," as the keys must to be considered an "illicit" label.  *See* 18 U.S.C. § 2318(b)(4).

7   Finally, the *Microsoft* cases do not offer support for Synopsys' bizarre proposition that (a) if illicit

8   Microsoft labels served the same function as Synopsys' product keys, (b) then the latter are also

9   "illicit" labels.  Synopsys grossly misreads the cases, which make clear that only the Microsoft

10  COAs that helped users verify if they received genuine copies (and not the Microsoft product

11  keys) constituted "illicit" labels.  *See Pronet* 593 F. Supp. 2d at 882 & n.15; *Microsoft Corp. v.*

12  *Ion Techs. Corp.*, 484 F. Supp. 2d 955, 961 (D. Minn. 2007).

13  **III.   PLAINTIFF'S SIXTH CLAIM FAILS TO STATE A CLAIM**

14        **A.   Plaintiff Fails to Plead a Predicate Act[6]**

15              **1.   Plaintiff Fails to State a Claim in Connection with Access Devices**

16        ***The keys are not a "means of account access."***  Synopsys accuses Defendants of

17  ignoring the legislative intent of 18 U.S.C. § 1029, but it is the one who misconstrues the statute.

18  "Congress intended the statute to cover circumstances involving the use of technology in

19  fraudulent credit transactions that might not be reached by other legislation.  It therefore included

20  a broad definition of 'access device'" for that purpose.  *U.S. v. Abozid*, 257 F.3d 191, 196 (2d Cir.

21  2001); *accord U.S. v. Bailey*, 41 F.3d 413, 417 (9th Cir. 1994) ("The purpose of the statute is to

22  deal with the abuse of new technologies that increasingly allow individuals and businesses access

23  to goods and services without immediate payment by cash or familiar, paper instruments.").

24        No court has found, as Synopsys argues here, that software license keys or computers

25  using such keys constitute a "means of account access"—and thus "access devices"—under

26  § 1029.  Synopsys does not offer any authority for this interpretation, or its incorrect notion that a

27

28  _____

[6] The sufficiency of the RICO predicate act under 18 U.S.C. § 2318 is addressed in Section II.

1    wide range of items may be "access devices" if used to access something of value.[7]  Most

2    importantly, Synopsys never attempts to explain how the alleged devices access an *account*,

3    defined by the Ninth Circuit as, "a contractual relationship that makes possible the provision of

4    goods, services, or money based on payment, or the expectation of payment, at some later point in

5    time, as described by the entry of *credits* and *debits* in a *formal record*."  *Bailey*, 41 F.3d at 417

6    (emphasis added).  While Synopsys cites other language from *Bailey*, it carefully avoids this

7    definition, because it is implausible that a software license key creates any type of debit or credit

8    relationship with the software user.[8]

9          Synopsys instead tries to describe the association of the keys with privileges of a "valid

10   licensed customer account," based on the license agreement and user account that enabled

11   Defendants to download licensed software.  (Opp. at 13.)  This logic fails for two reasons.  First,

12   the complaint alleges that the keys access software already downloaded onto the customer's

13   servers with Synopsys' permission, not any customer account on Synopsys' website—thus, only

14   the downloaded software may be construed as an "account."  (*See* FAC ¶¶ 44-45, 53.)  Second,

15   Synopsys has not shown how use of keys to *unilaterally* access *internal* software qualifies as

16   "account access."  In similar instances, courts have found that access of a "unilateral, internal"

17   business record, "as opposed to an on-going, or contemplated, contractual relationship between

18   two or more entities," cannot be an "account" access under § 1029(e)(1).  *See U.S. v. Bruce*, 531

19   F. Supp. 2d 983, 989 (N.D. Ill. 2008); *accord U.S. v. Lutz*, 2008 WL 4449082, at *4 (N.D. Ohio

20   Sept. 30, 2008).  Likewise, the access here is not of an "account" for purposes of the statute.

21

22   [7] None of the cited cases help Synopsys as each involved an "access device" found to be a
     "means of account access"—the central inquiry—under the statute.  *See Bailey*, 41 F.3d 413, 416,
23   418 ("account" was relationship between local carrier who expected repayment from distant
     carrier for providing service to tumbler phone user); *U.S. v. Sepulveda*, 115 F.3d 882, 884 (11th
24   Cir. 1997) ("account" was subscriber's account that was charged for service provided by carrier
     to cloned phone user); *Abozid*, 257 F.3d at 196 ("account" was credit relationship between airline
25   that honored validated tickets and travel agency); *U.S. v. Peterson*, 98 F.3d 502, 505 (9th Cir.
     1996) ("account" was hacked bank account that transferred money to another account).
26   [8] The language that Synopsys does highlight from *Bailey* does not stand for the suggested
     proposition that access to an "account" involves any method of obtaining goods or services from
27   which one would otherwise be excluded.  If that were the case, every password or key code would
     be an "access device," and every password-protected device or application, or even a secured
28   building, would be an "account."

1   ***Plaintiff has not adequately alleged specific violations.***   Even if use of license keys

2   constituted "account access," Synopsys has not adequately pled that (a) Defendants used

3   "unauthorized" access devices, as Synopsys acknowledges that it issued *genuine* temporary keys

4   for evaluation and appears to only take issue with their location of use, and (b) that Defendants

5   used "counterfeit" access devices within the meaning of § 1029.  Further, Synopsys still has not

6   shown under *Twombly* how the value of the "unauthorized" access devices (allegedly the

7   temporary keys) exceeded $1,000 during the "temporary" period under § 1029(a)(2); what the

8   alleged "tools" are that constitute device-making equipment under § 1029(a)(3); or how

9   Defendants possessed fifteen or more access devices under § 1029(a)(4).

10          **2.       Plaintiff Fails to State a Claim for Criminal Copyright Infringement**

11          ***Ordinary infringement does not suffice for RICO.***  Synopsys' response to the argument

12   that "run-of-the-mill" copyright infringement cannot be a RICO predicate act is simply that

13   legislative history may not be considered.  This is not Ninth Circuit law, which allows the Court

14   to look at legislative history *even when* the statute is clear if "it is brought to the court's attention

15   that there is within the legislative history something so probative of the intent of Congress as to

16   require a reevaluation of the meaning of the statutory language."  *Heppner v. Alyeska Pipeline*

17   *Serv. Co.*, 665 F.2d 868, 871 (9th Cir. 1981).  Further, the holding in *Stewart v. Wachowski*, 2005

18   WL 6184235 (C.D. Cal. June 14, 2005), that any infringement less than large-scale counterfeiting

19   and piracy should not constitute a RICO predicate act, is not unique and has been shared by other

20   courts.[9]  While Synopsys cites *H.J., Inc. v. Nw. Bell Tel. Co.*, for the proposition that plain

21   language governs in the RICO context, at issue there was the *RICO* statute, not *all* statutes that

22   might form a RICO predicate act.  492 U.S. 229, 245 (1989).

23          This Court should take guidance from legislative history that only the most complex,

24

25   _____

    [9] *See, e.g., Steward v. West*, 2013 WL 12120232, at *5-6 (C.D. Cal. Sept. 6, 2013); *Robert*
26   *Kubicek Architects & Assocs. Inc. v. Bosley*, 2012 WL 3149348, at *2 (D. Ariz. Aug. 1, 2012);
    *Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, 2013 WL 3943267, at *8 (S.D.N.Y. July 31,
27   2013); *CoStar Realty Info., Inc. v. Field*, 612 F. Supp. 2d 660, 676–77 (D. Md. 2009); *see also*
    Melville B. Nimmer and David Nimmer, 5 *Nimmer on Copyright* § 15.05 ("Only the most
28   egregious instances of criminal copyright infringement have ever been upheld as predicate
    offenses to racketeering charges under RICO.").

egregious cases of copyright infringement should be brought as a predicate act for a RICO claim. In this case, Synopsys has asserted a modest number of copyrighted works (thirteen), with vague allegations of their copyright value, what the "unauthorized" copies are (allegations of use do not go to infringement), and Synopsys' damages.  The scope of Synopsys' claim stands in stark contrast to its cited cases and criminal infringement claims that have been successfully brought under the RICO statute.[10]  Synopsys' attempt to apply RICO to an ordinary copyright dispute, when it chose not to bring a civil infringement claim in the first instance, should be rejected.

   ***Plaintiff has not alleged willful infringement.***  The allegations that Defendants made unauthorized copies of Synopsys software are defective under *Twombly* for a number of reasons, including for failure to identify the particular works that were infringed.  *See Synopsys, Inc. v. ATopTech, Inc.*, 2013 WL 5770542, at *4 (N.D. Cal. Oct. 24, 2013).  Synopsys points to supposed allegations of specific programs in the complaint (Opp. at 14), yet the only allegations identified that pertain to copying (FAC ¶¶ 29, 42) do not name "the specific software." Paragraphs 28 and 63, which do list programs by name, allege improper use—not copying—of Synopsys software. (*Id.* ¶¶ 28, 63.) Finally, paragraph 45 pertains to Mr. Tsai's use of Synopsys' download website, which Synopsys admits was authorized.  (*Id.* ¶ 45.)

   Synopsys argues that the complaint competently pleads willfulness by virtue of the license agreement entered into by Ubiquiti and Synopsys, which should have put Defendants on notice of the wrongfulness of their acts.  (Opp. at 14.)  But this allegation is not pled, nor does the complaint allege who personally signed the agreement or how knowledge of it could be imputed to *each* defendant.  Moreover, since Synopsys alleges that it did license software for evaluation purposes, for copying to be infringement, it must exceed the scope of the license.  *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 940 (9th Cir. 2010).  Synopsys has not sufficiently

---

[10] *See Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, 23 F. Supp. 3d 173, 192-93 (S.D.N.Y. 2014) (citing prosecuted § 2319 cases involving "significantly more complex and far-reaching organized counterfeiting schemes," including "software piracy conspiracy" involving 550 titles, 325 purchasers, and retail value of $100 million); *Bryant v. Mattel, Inc.*, 573 F. Supp. 2d 1254 (C.D. Cal. 2007) (former employee used proprietary designs to manufacture and sell dolls for annual revenue of $500 million); *Peter Rosenbaum Photography Corp. v. Otto Doosan Mail Order, Ltd.*, 2005 WL 2387687 (N.D. Ill. Sept. 26, 2005) (defendant published 65 copyrighted photographs in various catalogs and its website).

1   alleged how any "unauthorized" copying went intentionally and willfully beyond the scope of the

2   license.  *See Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 515 (9th Cir.

3   1985) (willfulness not found where defendants could have reasonably believed acts were non-

4   infringing).  As for Synopsys' claim that Defendants' actions continued after a cease and desist

5   demand (Opp. at 14), the complaint alleges the May 2016 demand pertained to "unauthorized

6   use" of its software and makes no mention of copying.  (FAC ¶ 65.)

### 3.        Plaintiff Fails to State a Claim for Wire Fraud

8        ***Plaintiff has not alleged actionable material misrepresentations or omissions.***  Synopsys

9   misapprehends the meaning of "scheme to defraud" under the wire fraud statute.  It is not

10  sufficient to point to communications and claim that they were all a part of a "scheme" and thus

11  sufficient to constitute "predicate communications" for purposes of RICO.  A scheme to defraud

12  "require[s] a misrepresentation or concealment of material fact."  *Neder v. U.S.*, 527 U.S. 1, 22

13  (1999).  Synopsys must identify specific allegedly fraudulent statements, and for each, must plead

14  with particularity *why it was materially false when made.  Cafasso, U.S. ex rel. v. Gen. Dynamics*

15  *C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (emphasis added).

16       In connection with its wire fraud arguments, Synopsys does not even address Defendants'

17  arguments about Synopsys' failure to plead an affirmative material misstatement or actionable

18  omission.  Synopsys does address these arguments in connection with its common law fraud and

19  negligent misrepresentation arguments.  However, even there, Synopsys does not even *attempt* to

20  explain why each allegedly false or misleading statement was false or misleading when made.

21  Rather, like the complaint, Synopsys once again provides the same list of statements without

22  addressing as to each the reasons why it was materially false when made.

23       Synopsys also advances two new, alternative theories, neither of which can be found in

24  the complaint.  First, Synopsys suggests that Mr. Tsai made a "promise to perform" that was

25  knowingly fraudulent.  This concept of "promissory fraud" is a concept under California law, but

26  not under federal wire fraud.  In fact, in *Synapsis v. Evergreen Data Systems*, the court found that

27  the plaintiff had adequately pled fraud under a theory of "promissory fraud," but had *not*

28  sufficiently pled wire fraud.  2006 WL 44239, at *6-7 (N.D. Cal. Jan. 9, 2006).  Here, Synopsys

1    does not identify a single statement by Mr. Tsai or anyone that could conceivably be construed as

2    an "assurance" or a promise to perform.  And even if it had, Synopsys cites no authority for the

3    applicability of the state law concept of promissory fraud in the federal wire fraud analysis.[11]

4         The other new theory advanced by Synopsys is that Mr. Tsai committed wire fraud under

5    a "half-truth" theory.  The "half-truth" theory comes from a line of Ninth Circuit authority

6    involving statements that while literally true or technically accurate, are so affirmatively

7    misleading that they amount to misrepresentations.[12]  Even if Synopsys had pled fraud based on a

8    "half-truth" theory, the case law does not support such a theory here.

9         ***Plaintiff has not alleged use of any interstate wires.***  Synopsys does not dispute that to

10   allege a violation of the wire fraud statute, it is necessary to show the "use of interstate or foreign

11   wires."  (Opp. at 16.)  Acknowledging that none of the actual alleged misrepresentations were

12   made via interstate or foreign wire, Synopsys claims the complaint describes "multiple instances"

13   where Defendants used interstate or foreign wires to further the "scheme."  (*Id.*)  Yet *none* of the

14   paragraphs of the complaint cited by Synopsys allege the use of interstate or foreign wires.

15        Synopsys states that the complaint alleges that "UNIL (from Taiwan) communicated with

16   Synopsys in furtherance of their scheme," citing the complaint at paragraphs 49 to 51.  (*Id.*)  Yet

17   these paragraphs refer to an email communication between Mr. Tsai (while he was physically

18   located in California) and Synopsys, and in-person meetings between Mr. Tsai and Synopsys that

19   took place in Taiwan.  (FAC ¶¶ 49-51.)  While paragraph 49 references UNIL employees, it does

20   not, as Synopsys now suggests, state that they were in Taiwan.  Similarly, Synopsys states that

21

---

22   [11] The only other wire fraud case that Synopsys cites for its "promissory fraud" theory is *Sussex Financial Enterprises v. Bayerische Hypo-Und Vereinsbank AG*, 2010 WL 94272, at *5 (Jan. 6. 2010).  *Sussex* involved a defendant who agreed to act as a lender in a tax benefits program and made "assurance[s]" that other participants would be able to enjoy these tax benefits, while knowing that the loans would not satisfy a 30-year requirement because defendants intended to unwind the loans after one year.  The court found that the affirmation of willingness to participate in the 30-year program while intending to unwind the loans could constitute wire fraud.  The court, in the context of state-law fraud, found that Sussex had also alleged "promissory fraud," but did *not* suggest this concept had any place in federal wire fraud analysis.

23

24

25

26   [12] *See, e.g., U.S. v. Woods*, 335 F.3d 993, 997-98 (9th Cir. 2003) (wire fraud conviction based on telemarketing scam, in which callers told elderly people they were selected to win a "designer diamond watch," and refused to disclose the watch's value ($28) because "the price of diamonds varied from coast to coast," then told the victims they needed to send money (ranging from $299 to $866) which purportedly represented the cost of receiving the award (worth $28)).

27

28

1   UNIL "used the internet to contact Synopsys' customer service support in California."  (Opp. at

2   16-17.)  But neither of the paragraphs cited in support (FAC ¶¶ 55, 56) identify the location of

3   this alleged internet use.  Synopsys contends that Defendants "contemplated that any software

4   that Tsai or Ubiquiti acquired would be transported via wires to UNIL in Taiwan" (*id*. at 17), but

5   does not cite any allegation because it is not pled.  Any time the complaint specifies the location

6   of any individuals or events, it specifies that they occurred exclusively in California, or

7   exclusively in Taiwan.  Synopsys is stuck with the allegations it pled; it cannot supplement them

8   via elaboration in an opposition brief.  Synopsys thus has not pled the use of interstate or foreign

9   wires in connection with the alleged scheme.  *Smith v. Ayres*, 845 F.2d 1360, 1366 (5th Cir. 1988)

10  (affirming dismissal of RICO charges based on intrastate wire communications).

11  **B.    Plaintiff's 1962(c) RICO Claim Fails for Additional Reasons**

12  ***Plaintiff has not alleged a "pattern" of racketeering.***  Synopsys claims that it has

13  sufficiently alleged a pattern of racketeering activity because (a) the alleged scheme spann[ed]

14  from October 2013 to June 2016, and (b) the complaint "alleges predicate acts that by their nature

15  project into the future with a threat of repetition."  (Opp. at 18.)  It has not.

16  With regard to the allegedly continuous pattern of criminal activity spanning three years,

17  by Synopsys' own account, nearly all of the alleged predicate acts occurred between October

18  2013 and April 2014.  (*See id.* at n.14.)  The only alleged activity occurring beyond that seven-

19  month period is alleged "traffick[ing] and use [of] counterfeit keys to access Synopsys software

20  from March 2014 until June 2016."  (*Id.*)  As explained above, neither software license keys nor

21  the computers using such keys constitutes "access devices" under § 1029.  Thus, even assuming

22  Synopsys had adequately pled all predicate acts other than its § 1029 claim (and it did not), by

23  Synopsys' own account the alleged "scheme" occurred over a seven-month period.  What

24  Synopsys is trying to do here is to extend the purported "scheme" long past the commission of

25  alleged predicate acts (spanning seven months) based on allegations that Defendants continued to

26  benefit from the alleged scheme until June 2016.  But Defendants are not aware of any authority

27  supporting the proposition that a pattern can be established based on continuing receipt of

28  benefits from a scheme, after the actual predicate acts were completed, and Synopsys cites none.

While Synopsys acknowledges that the complaint shows that the purported "scheme" ended in June 2016 (Opp. at 18), it now contends that there is a threat of future repetition because "Defendants still possess unauthorized copies of Synopsys' software, still have the tools and know-how required to create and use counterfeit license keys, and still employ the same individuals responsible for the criminal conduct at issue…" (*Id.*)  Notably, Synopsys does not include a citation to the complaint for these allegations, nor could it, because there are none.  Nor do the cases cited by Synopsys support a finding of open-ended continuity here.  The quoted language in *United States v. Philip Morris USA*, 566 F.3d 1095 (D.C. Cir. 2009), did not relate to the question of RICO pattern, but whether injunctive relief was appropriate, and the Court found that it was, not just because the businesses at issue presented continuing opportunities to violate RICO, but because they continued to make false and misleading statements at the time of trial. *Id.* at 1109.  In *Tabas v. Tabas*, 47 F.3d 1280 (3d Cir. 1995), continuity was found where defendants, as a regular way of doing business, fraudulently mispresented expenses, and where these practices continued even after an audit report found fraud, and after the plaintiff's complaint was filed.  And *NSI Techs. v. NASA*, 1996 U.S. Dist. LEXIS 22455 (N.D. Cal. May 13, 1996), involved a scheme that included 70 racketeering acts over the course of nearly two years, aimed at multiple contracts, which only ended when two of the perpetrators were arrested and confessed.  Here, Plaintiff's allegations, which focus on one individual and interactions involving one company (Synopsys), hardly support the conclusion that criminal activities were Defendants' regular way of doing business.  Even if Synopsys had pled that this was Defendants' regular way of doing business (it did not), the complaint allegations would not support such a conclusion.

***Plaintiff has not alleged a RICO "person" distinct from the enterprise.***  Synopsys asserts that "it is axiomatic that corporations act through their employees."  (Opp. at 11 n.9.)  Indeed it is.  And this is precisely why Synopsys' enterprise allegations (and as discussed below, its conspiracy allegations) fail.  Ubiquiti and UNIL cannot be both the defendants and the RICO enterprise, regardless of whether the alleged "Piracy Enterprise" includes Tsai and other employees. "[When] the named defendant is a collective entity – one that can act only through its agents or constituent parts – and the alleged enterprise is comprised of the entity and its agents or other

1    constituents" is a situation that "[w]ith perhaps a rare exception . . . is held to blur impermissibly

2    the person/enterprise distinction."  Joseph, Gregory P., *Civil RICO: A Definitive Guide* 41 (4th ed.

3    2015).[13]  As the Seventh Circuit explained, to avoid the "far-fetched possibility" that every fraud

4    case against a company could become a RICO case by alleging the company plus its employees

5    constituted an "enterprise," the courts have held "that an employer and its employees cannot

6    constitute a RICO enterprise."  *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 228 (7th Cir. 1997).

7         Synopsys suggests that Defendants' argument is foreclosed by Ninth Circuit law (Opp. at

8    20), but its cited authority, *Webster v. Omnitrition Int'l, Inc.,* 79 F.3d 776 (9th Cir. 1996),

9    addresses an entirely different issue: whether corporate affiliates can form a RICO conspiracy—

10   not whether an enterprise consisting of a corporation, its subsidiary, and employees is sufficiently

11   distinct.[14]  Courts have even held that adding third-party representatives who play a role in the

12   company's business into an alleged enterprise does not render such enterprise sufficiently distinct

13   from the corporate entity defendant.  *See, e.g., Fitzgerald*, 116 F.3d at 228 (Chrysler, its dealers,

14   and subsidiaries did not constitute a separate and distinct enterprise because the dealers were only

15   a conduit to sell Chrysler's cars); *Kaczmarek v. Int'l Bus. Machs. Corp.*, 30 F. Supp. 2d 626, 630

16   (S.D.N.Y. 1998) (IBM and its dealers and resellers not sufficiently distinct).  Synopsys does not

17   include any enterprise members outside of the corporate entity.  Its enterprise allegations thus fail.

18        ***Plaintiff has not alleged that any defendant "conducts the affairs" of the RICO***

19   ***enterprise.***  Synopsys does not even address Defendants' argument that the Complaint fails to

20   plead that Defendants were doing anything more than conducting their own affairs (and not the

21   affairs of some purported enterprise).  For this additional reason, Synopsys' RICO claims fail.

22   **IV.    PLAINTIFF HAS NOT STATED A CLAIM FOR RICO CONSPIRACY**

23        Synopsys contends that it has not, in fact, alleged a conspiracy of one.  Yet that is

24   _____

25   [13] The only case raised by Defendants that Synopsys even addressed is not inapposite as it claims,
     but is directly on point because here, as in *Ice Cream Distribs. Of Evansville, LLC v. Dreyer's*

26   *Grand Ice Cream, Inc.*, Synopsys is alleging that the same individuals and entities are both the
     RICO persons and RICO enterprise.  2010 WL 3619884, at *5 (N.D. Cal. Sept. 10, 2010).

27   [14] Similarly, *United States v. Blinder*, 10 F.3d 1468 (9th Cir. 1993), and *United Energy Owners*
     *Committee v. United States Energy Mgmt.*, 837 F.2d 356 (9th Cir. 1988), addressed an entirely

28   different question—whether the enterprise had an existence separate from the alleged pattern of
     racketeering.

1   precisely what it has done.  The only actions Synopsys identifies with any specificity are actions

2   by Mr. Tsai.  On the basis of those alleged actions, Synopsys attempts to bring a claim that

3   depends upon concerted action.  The allegations cited by Synopsys include that "Tsai, Ubiquiti

4   and UNIL" conspired, and "took steps in furtherance" of the alleged conspiracy.  What Synopsys'

5   allegations boil down to is that Tsai on behalf of Ubiquiti, and Tsai on behalf of UNIL, and Tsai

6   on behalf of himself entered into an agreement and took steps in furtherance of such agreement.

7   Synopsys cites no authority for the proposition that a conspiracy is sufficiently alleged in this

8   manner, or that a plaintiff can allege a conspiracy based on the actions of one person in hope that

9   discovery will reveal that others were involved.

10  **V.    PLAINTIFF'S FIFTH AND SEVENTH CLAIMS FAIL TO STATE CLAIMS**

11            As set forth above regarding Synopsys' wire fraud claim (*see supra* at Section III.A.3),

12  Synopsys' listing of innocuous statements without explaining why each was false when made,

13  and characterizing them all as false because of an allegedly undisclosed "scheme," fails to meet

14  Rule 9(b)'s stringent requirements.  And as also explained, Synopsys now attempts to rescue its

15  fraud claims by re-casting them as "promissory fraud" or "half-truths."  (Opp. at 23-24.)  First,

16  these new theories are not in the complaint.  Nonetheless, Synopsys now claims that Mr. Tsai's

17  representations constituted promises that Ubiquiti and UNIL were going to enter into an

18  agreement with Synopsys, which were made without any intention to perform on such promises.

19  (*Id*. at 24.)  As the name suggests, "promissory fraud" assumes the making of a promise.  But no

20  such promise was identified (or made) here.  The communications upon which Synopsys relies

21  merely suggest that Ubiquiti was engaging in a normal process of evaluating a tool for potential

22  purchase.  (*Id.* at 22.)  If these statements are sufficient to constitute promissory fraud, then any

23  time a company considers but then declines to enter into an agreement after an evaluation or

24  negotiation period, the company would be subject to liability for fraud.  This cannot be the law,

25  and none of the authority cited by Synopsys supports such a conclusion.  The half-truth theory of

26  fraud, where statements that are literally true are considered so affirmatively misleading as to

27  constitute fraud (as discussed above), also has no application here.

28

1

2    Dated:  May 2, 2017                         JENNIFER LEE TAYLOR
                                                 STACEY M. SPRENKEL
3                                                JOYCE LIOU
                                                 AMANDA D. PHILLIPS
4                                                MORRISON & FOERSTER LLP

5
                                          By:    /s/ Jennifer Lee Taylor
6                                                JENNIFER LEE TAYLOR

7                                                *Attorneys for Defendants*
                                                 UBIQUITI NETWORKS, INC. and
8                                                CHING-HAN TSAI

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28