1  DENISE M. MINGRONE (STATE BAR NO. 135224)
   dmingrone@orrick.com
2  ROBERT L. URIARTE (STATE BAR NO. 258274)
   ruriarte@orrick.com
3  ORRICK, HERRINGTON & SUTCLIFFE LLP
   1000 Marsh Road
4  Menlo Park, CA 94025-1015
   Telephone:    +1 650 614 7400
5  Facsimile:    +1 650 614 7401

6  CLAUDIA WILSON FROST (*Pro Hac Vice*)
   cfrost@orrick.com
7  ORRICK, HERRINGTON & SUTCLIFFE LLP
   609 Main Street, 40th Floor
8  Houston, TX  77002-3106
   Telephone:    +1 713- 658 6460
9  Facsimile:    +1 713 658 6401

10 Attorneys for Plaintiff/Counterdefendant
   SYNOPSYS, INC.

11

12                   IN THE UNITED STATES DISTRICT COURT

13                   NORTHERN DISTRICT OF CALIFORNIA

14                      SAN FRANCISCO DIVISION

15

16 SYNOPSYS, INC.,                           Case No. 3:17-cv-00561-WHO

17               Plaintiff,                  **PLAINTIFF SYNOPSYS, INC.'S
                                             MOTION TO EXCLUDE EXPERT**
18        v.                                 **TESTIMONY**

19 UBIQUITI NETWORKS, INC., UBIQUITI
   NETWORKS INTERNATIONAL LIMITED,
20 CHING-HAN TSAI, and DOES 1-20,           Date:   January 23, 2019
   inclusive,                               Time:  2:00 p.m.
21                                          Dept.: Courtroom 2, 17th Floor
               Defendants.                  Judge: Hon. William H. Orrick
22
   UBIQUITI NETWORKS, INC. AND
23 UBIQUITI NETWORKS INTERNATIONAL
   LIMITED,
24
               Counterclaimants,
25
          v.
26
   SYNOPSYS, INC.,
27
               Counterdefendant.
28

ORRICK, HERRINGTON &
  SUTCLIFFE LLP
  ATTORNEYS AT LAW
   SILICON VALLEY

# TABLE OF CONTENTS

**Page No.**

NOTICE OF MOTION AND MOTION ................................................................. I

I.      INTRODUCTION .................................................................................... 1

II.     STUBBLEBINE'S "INVOCATIONS" OPINION SHOULD BE EXCLUDED ................. 1

    A.      Factual Background ........................................................................ 2

    B.      Stubblebine's "Invocations" Opinion Fails the *Daubert* Relevancy Test ............... 3

    C.      Stubblebine's Invocations Analysis Fails the *Daubert* Reliability Test ................. 6

        1.      Stubblebine's "invocations" analysis is not supported by any legitimate methodology .................................................................................. 7

        2.      Stubblebine's opinions are not based on sufficient data ............................. 9

        3.      Stubblebine's analysis is not testable or subject to repetition ................... 10

    D.      Defendants' Invocations Argument Seeks to Profit from Defendants' Spoliation and Withholding of Evidence ............................................................... 12

III.    FOX'S BUSINESS JUDGMENT RULE OPINION SHOULD BE EXCLUDED ........... 13

    A.      Factual Background ...................................................................... 14

    B.      The Business Judgment Rule Does Not Apply to Suits by Corporate Outsiders .. 15

    C.      It Is Undisputed That Ubiquiti/UNIL's Liability Is Governed by Principles of Agency Law ............................................................................... 15

IV.     KENNEDY'S LEGAL OPINIONS ABOUT DOUBLE RECOVERY SHOULD BE EXCLUDED ........................................................................................... 16

    A.      Factual Background ...................................................................... 16

    B.      Kennedy's Opinions on the Double-Recovery Rule Should Be Excluded Because They Are Legal Opinions ................................................................ 17

V.      CONCLUSION ....................................................................................... 18

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- i -

PLAINTIFF SYNOPSYS, INC.'S MOTION TO
EXCLUDE EXPERT TESTIMONY
3:17-CV-00561-WHO

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Adobe Sys. v. Feather*,
    895 F. Supp. 2d 297 (D. Conn. 2012) ...................................................................................4

5

6

*Aero Products International, Inc. v. Intex Recreation Corp.*,
    466 F.3d 1000 (Fed. Cir. 2007)...........................................................................................17

7

8

*Arista Records LLC v. Usenet.com, Inc.*,
    608 F. Supp. 2d 409 (S.D.N.Y. 2009)..................................................................................13

9

*Bank of N.Y. Mellon v. WMC Mortg., LLC*,
    No. 12cv7096, 2015 U.S. Dist. LEXIS 108320 (S.D.N.Y. Aug. 17, 2015) ............................12

10

11

*Blizzard Entm't, Inc. v. Reeves*,
    No. 09-7621 SVW, 2010 U.S. Dist. LEXIS 85560 (C.D. Cal. Aug. 10, 2010).................3, 4, 5

12

13

*Britton v. Maloney*,
    196 F.3d 24 (1st Cir. 1999) ..................................................................................................17

14

*Bruno v. Bozzuto's, Inc.*,
    311 F.R.D. 124 (M.D. Pa. 2015)...........................................................................................12

15

16

*City of Pomona v. SQM N. Am. Corp.*,
    750 F.3d 1036 (9th Cir. 2014).........................................................................................10, 11

17

18

*In re Colony Beach & Tennis Club Ass'n, Inc.*,
    456 B.R. 545 (M.D. Fla. 2011) .............................................................................................15

19

*In re Countrywide Fin. Corp. Mortgage-Backed Secs. Litig.*,
    984 F. Supp. 2d 1021 (C.D. Cal. 2013).................................................................................10

20

21

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ....................................................................................................... *passim*

22

*Daubert v. Merrell Dow Pharms. Inc.*,
    43 F.3d 1311 (9th Cir. 1995)..............................................................................................6, 7

23

24

*DCS Mktg., Inc. v. Homer Laughlin China Co.*,
    No. SA CV 09-144 DOC, 2009 WL 10674051 (C.D. Cal. Nov. 5, 2009) .........................15, 17

25

26

*Dish Network LLC v. Ward*,
    No. 8:08-cv-590-T-30TBM, 2010 U.S. Dist. LEXIS 142090 (M.D. Fla. Jan. 8,
    2010) ...........................................................................................................................................3

27

28

*Disney Enters. v. VidAngel, Inc.*,
224 F. Supp. 3d 957 (C.D. Cal. 2016)........................................................................5

*FTC v. Wellness Support Network, Inc.*,
No, 10-cv-04879-JCS, 2013 U.S. Dist. LEXIS 144140 (N.D. Cal. Oct. 4, 2013)....................9

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)........................................................................9, 10

*Haddley v. Next Chapter Tech., Inc.*,
No. 16-1960, 2018 U.S. Dist. LEXIS 164910 (D. Minn. Sept. 26, 2018) ................................4

*Halcomb v. Wash. Metro. Area Transit Auth.*,
526 F. Supp. 2d 24 (D.D.C. 2007) ........................................................................11

*Innis Arden Golf Club v. Pitney Bowes, Inc.*,
629 F. Supp. 2d 175 (D. Conn. 2009) ........................................................................12

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)........................................................................3, 15

*McKnight v. Midwest Eye Inst. of Kansas City, Inc.*,
799 S.W.2d 909 (Mo. Ct. App. 1990)........................................................................15

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
629 F.3d 928 (9th Cir. 2010)........................................................................3, 4, 5

*Moore v. Napolitano*,
926 F. Supp. 2d 8 (D.D.C. 2013) ........................................................................11

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
523 F.3d 1051 (9th Cir. 2008)........................................................................17

*Nintendo of Am., Inc. v. Bung Enters.*,
No. 97-8511-GAF, 1999 U.S. Dist. LEXIS 23588 (C.D. Cal. Dec. 15, 1999)........................4

*Paul Revere Life Ins. Co. v. Jafari*,
No. MJG-00-2705, 2002 U.S. Dist. LEXIS 28224 (D. Md. Sept. 19, 2002)........................12

*Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., LTD*,
No. 11-CV-726, 2012 U.S. Dist. LEXIS 113791 (E.D.N.Y. June 13, 2012) ........................3, 5

*Soldo v. Sandoz Pharms. Corp.*,
244 F. Supp. 2d 434 (W.D. Pa. 2003) ........................................................................12

*Southern Star Cent. Gas Pipeline, Inc. v. 120 Acres Located in Rice Cty.*,
No. 09-2435-EFM-GLR, 2012 U.S. Dist. LEXIS 38622 (D. Kan. Mar. 22, 2012) ........................12

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ................................................................................................18

*Stephenson v. Caterpillar Inc.*,
    No. 2:16-CV-00071-JRG, 2018 U.S. Dist. LEXIS 201628 (E.D. Tex. Oct. 30,
    2018) ........................................................................................................................13

*Stockwire Research Grp., Inc. v. Lebed*,
    577 F. Supp. 2d 1262 (S.D. Fla. 2008) ...............................................................3, 5

*United States v. Scholl*,
    166 F.3d 964 (9th Cir. 1999) ...................................................................................16

*United States v. Williams*,
    No. 3:13-cr-00764-WHO, 2017 U.S. Dist. LEXIS 129944 (N.D. Cal. Aug. 15,
    2017) ...........................................................................................................7, 8, 9, 13

*Unitrin, Inc. v. Am. Gen. Corp.*,
    651 A.2d 1361 (Del. 1995) .......................................................................................15

*Uthe Tech. Corp. v. Aetrium, Inc.*,
    808 F.3d 755 (9th Cir. 2015) ...................................................................................17

*VBConversions LLC v. Gulf Coast Ventures, Inc.*,
    No. 12-8265 JGB, 2016 U.S. Dist. LEXIS 105760 (C.D. Cal. Aug. 10, 2016).........................4

*Villalpando v. Exel Direct, Inc.*,
    161 F. Supp. 3d 873 (N.D. Cal. 2016) ................................................................15, 17

**Statutes**

17 U.S.C. § 1201(a) ............................................................................................1, 3, 4

17 U.S.C. § 1203(c)(3) ........................................................................................1, 3, 4

Cal. Corp. Code § 309 ................................................................................................15

**Other Authorities**

Fed. R. Civ. P 26(a)(2)(B)...........................................................................................11

Fed. R. Evid. 403 ...........................................................................................6, 13, 16

Fed. R. Evid. 702 .............................................................................................6, 10, 11

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- iv -

PLAINTIFF SYNOPSYS, INC.'S MOTION TO
EXCLUDE EXPERT TESTIMONY
3:17-CV-00561-WHO

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:  PLEASE TAKE NOTICE that the following Motion to Exclude Expert Testimony, will be heard on January 23, 2019, at 2:00 p.m., or as soon thereafter as counsel may be heard, in Courtroom 2, 17th Floor of this Court, located at 450 Golden Gate Avenue, San Francisco, California, the Honorable William H. Orrick presiding.

Plaintiff Synopsys, Inc. will, and hereby does, move this Court to exclude certain testimony of retained defense experts Stuart Stubblebine, Merritt Fox, and Patrick Kennedy, on the grounds that the subject testimony fails to meet the applicable standards for admissibility under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and Federal Rules of Evidence 401, 402, 403 and 702.

This Motion is based on this Notice of Motion and Motion; the Memorandum of Points and Authorities below; the materials attached to the Declaration of Denise M. Mingrone (cited hereinafter as "Ex. __") that are being filed herewith; the record in this matter; and such other and further papers, evidence, and argument as may be submitted in connection with this Motion.

Dated: December 19, 2018

DENISE M. MINGRONE
CLAUDIA WILSON FROST
ROBERT L. URIARTE
ORRICK, HERRINGTON & SUTCLIFFE LLP


By: */s/ Denise M. Mingrone*
　　　DENISE M. MINGRONE

Attorneys for Plaintiff
SYNOPSYS, INC.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- I -

PLAINTIFF SYNOPSYS, INC.'S MOTION TO
EXCLUDE EXPERT TESTIMONY
3:17-cv-00561-WHO

## I.    INTRODUCTION

Synopsys moves to exclude from evidence certain opinions of: (1) Stuart Stubblebine, Ubiquiti/UNIL's source code expert, because his opinion is not based on proper scientific methodology but rather rests on legally irrelevant, subjective conclusions designed to confuse the jury; (2) Merritt Fox, Ubiquiti/UNIL's rebuttal expert on corporate governance, because Fox's opinions rely upon a misapplication of the law and will confuse, rather than assist, the jury; and (3) Dr. Patrick Kennedy, Ubiquiti/UNIL's rebuttal damages expert, to the extent he opines on and seeks to testify about the double recovery rule, which is a legal issue that should be addressed by the Court through instructions to the jury.

## II.    STUBBLEBINE'S "INVOCATIONS" OPINION SHOULD BE EXCLUDED

The DMCA prevents "circumvention" of software access controls and copyright protection controls, 17 U.S.C. § 1201(a)(1), and provides for statutory damages "per act of circumvention," 17 U.S.C. § 1203(c)(3). This case involves Defendants' use of counterfeit license keys to circumvent Synopsys' license-key access control measures. Synopsys' call-home data shows that Defendants used counterfeit license keys to run Synopsys software 38,351 times.

But Defendants don't want to talk about their number of circumventions. Instead, Defendants want retained expert Stuart Stubblebine to confuse the jury with speculation about the number of "invocations" (*not* circumventions) of Synopsys' software—a made-for-litigation concept that focuses on the number of key strokes Defendants used to illegally run Synopsys' software. According to Stubblebine, *if* Defendants entered a single script[1] to automatically launch five different applications, such script running should only count as one "invocation" of Synopsys' software. Stubblebine even goes so far as to group two separate applications running on *two different computers* as a single "invocation." Ex. 1 (Edwards Rebuttal) ¶¶ 60-64. Stubblebine's invocations theory is totally divorced from the text of the DMCA, which prohibits

---

[1] A script is "a file containing commands or other actions that could have been entered from the keyboard." Oxford Dictionary of Computer Science, 7th ed. (http://www.oxfordreference.com/abstract/10.1093/acref/9780199688975.001.0001/acref-9780199688975-e-4635?rskey=tApAYA&result=5086). Synopsys provides template scripts for some of its products, but users must provide inputs into such template scripts in order for the scripts to work. Ex. 2 (Salz 11/9/2018 Dep.) at 484:10-485:9.

1   unauthorized "circumvention," not unauthorized "invocation." Thus, even if Stubblebine's

2   "invocations estimate" were based on sound scientific methodology (which it is not), it would be

3   inadmissible. Stubblebine's invocations opinion is a transparent attempt to confuse the jury with

4   a number that bears no relationship to the DMCA or to any other claims at issue in the case.

5       A.    **Factual Background**

6       Synopsys has been using Flexera's FlexNet license key management software to control

7   access to Synopsys' EDA applications for more than 20 years. FlexNet's general function is to

8   check for product license keys that contain required cryptographic signatures. Ex. 3 (Edwards

9   Report) ¶ 30. The parties' experts agree about how the FlexNet license key check-out software

10  works within Synopsys' EDA applications. Ex. 1 (Edwards Rebuttal) ¶ 13 (quoting *inter alia*

11  Stubblebine Report ¶¶ 83, 84, 88).

12      To explain Synopsys' access control measures briefly: Synopsys' provides licensees with

13  cryptographic license keys that enable the licensees to run Synopsys software. Each Synopsys

14  EDA application attempts to check-out a license key each time the application begins to execute.

15  Ex. 3 (Edwards Report) ¶ 31. If the license key check-out fails because the required

16  cryptographic key signature is incorrect (or missing), Synopsys' EDA applications immediately

17  terminate, preventing the user from running the software. Ex. 1 (Edwards Rebuttal) ¶ 13

18  (similar). Stubblebine does not dispute any of these facts. *Id* (discussing agreement between the

19  parties' experts on license check out functions).

20      It is undisputed that Ubiquiti and UNIL employees used counterfeit license keys to

21  execute Synopsys EDA applications. Ex. 5 (Radigan 30(b)(6) 4/26/2018 Dep.) at 363:9-20.[2] It is

22  also undisputed that Defendants' counterfeit key usage caused Synopsys' EDA applications to

23  send call-home messages back to Synopsys. *See, e.g.*, Ex. 3 (Edwards Report) ¶ 43.[3] Synopsys'

_____

24  [2] Remnants of spoliated piracy software found in unallocated space on Defendants' servers
25  indicate that Ubiquiti and UNIL employees used key generation software to create counterfeit
    Synopsys license keys that had the required cryptographic signatures. ECF No. 241-1; Roffman
26  Decl. ¶ 7(xi).

27  [3] As explained in Synopsys' opposition to Defendants' summary judgment motion (ECF No.298-
    4 at 5-7), Synopsys has a second security mechanism built into its software (distinct from the
    Flexera license check-out software) that generates call-home messages under certain conditions,
28  which Synopsys then investigates to determine whether the call home was the result of innocent
    user error or unauthorized software use.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 2 -

PLAINTIFF SYNOPSYS, INC.'S MOTION TO
EXCLUDE EXPERT TESTIMONY
3:17-cv-00561-WHO

1  call-home data shows that Defendants used counterfeit license keys to run Synopsys applications

2  38,351 times.

3      **B.      Stubblebine's "Invocations" Opinion Fails the *Daubert* Relevancy Test**

4      *Daubert* requires a valid "connection to the pertinent inquiry as a precondition to

5  admissibility" of expert testimony.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)

6  (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993)).  Stubblebine's

7  "invocations" analysis fails this test, because it has nothing to do with the only pertinent inquiry

8  under the DMCA: the number of times Defendants used counterfeit keys to circumvent Synopsys'

9  software-access controls.

10     Section 1201(a) creates a "new anti-circumvention right" that is violated by the "act" of

11 "circumvention itself."  *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 946 (9th Cir.

12 2010).  As used in § 1201(a), circumvention means, *inter alia*, "to avoid, bypass, remove,

13 deactivate, or impair a technological measure, without the authority of the copyright owner."  17

14 U.S.C. § 1201(a)(3)(A).  A prevailing plaintiff is entitled to elect statutory damages "for each

15 violation of section 1201 in the sum of not less than $200 or more than $2,500 *per act of*

16 *circumvention*."  *Id.* § 1203(c)(3)(A) (emphasis added).  Every court to consider the issue has

17 held that the "per act of circumvention" language of § 1203(c)(3)(A) requires courts to look to the

18 number of times defendants used circumvention technology to gain unauthorized access to the

19 software or system at issue.  *Blizzard Entm't, Inc. v. Reeves*, No. 09-7621 SVW, 2010 U.S. Dist.

20 LEXIS 85560, at *5 (C.D. Cal. Aug. 10, 2010) (focusing on number of times circumvention

21 technology was used to access software); *Stockwire Research Grp., Inc. v. Lebed,* 577 F. Supp. 2d

22 1262, 1268 n.10 (S.D. Fla. 2008) (same); *Point 4 Data Corp. v. Tri-State Surgical Supply &*

23 *Equip., LTD*, No. 11-CV-726, 2012 U.S. Dist. LEXIS 113791, at *40 (E.D.N.Y. June 13, 2012)

24 (same); *see also Dish Network LLC v. Ward*, No. 8:08-cv-590-T-30TBM, 2010 U.S. Dist. LEXIS

25 142090, at *7 (M.D. Fla. Jan. 8, 2010) (user uploaded 47 files, held liable for trafficking statutory

26 damages based on 255,741 times files were downloaded).

27     Because Synopsys' license keys control access to Synopsys software, each use of a

28 counterfeit license key to execute Synopsys EDA applications is an "act of circumvention" for

1    purposes of calculating statutory damages under § 1203(c)(3)(A).  *See, e.g.*, *Nintendo of Am., Inc.*

2    *v. Bung Enters.*, No. 97-8511-GAF, 1999 U.S. Dist. LEXIS 23588, at *33 (C.D. Cal. Dec. 15,

3    1999) (unauthorized electronic key files are circumvention technology); *VBConversions LLC v.*

4    *Gulf Coast Ventures, Inc.,* No. 12-8265 JGB, 2016 U.S. Dist. LEXIS 105760, at *16 (C.D. Cal.

5    Aug. 10, 2016) (use of unauthorized license keys violates DMCA); *Adobe Sys. v. Feather*, 895 F.

6    Supp. 2d 297, 302 (D. Conn. 2012) (same); *Haddley v. Next Chapter Tech., Inc.,* No. 16-1960,

7    2018 U.S. Dist. LEXIS 164910, at *16 (D. Minn. Sept. 26, 2018) (similar).[4]

8         Accordingly, as the statutory damages provision makes clear, violations of § 1201(a)(1) of

9    the DMCA are based on "the number of times that [Synopsys'] anti-piracy mechanisms have

10   been by-passed or the number of times that Defendant's servers performed their infringing

11   services for users," *Reeves*, 2010 U.S. Dist. LEXIS 85560, at *5, and the only "pertinent inquiry"

12   under *Daubert* is therefore the number of times Defendants used counterfeit license keys.

13   Synopsys will prove at trial that defendants used counterfeit keys to execute Synopsys EDA

14   applications 38,351 times, resulting in 38,351 unique call-home messages to Synopsys.

15        Defendants want Stubblebine to present a different number to the jury:  16,991.  But this

16   number does not purport to measure the number of times Defendants circumvented Synopsys'

17   access control measures to run Synopsys EDA applications.  Rather, 16,991 is Stubblebine's

18   speculative estimate of the number of "invocations" of Synopsys' software, a nebulous concept

19   that Stubblebine made up specifically for this litigation.  Ex. 6 (Stubblebine Dep.) at 255:6-8

20   ("My notion of invocation was particular to the [] call home records").  Stubblebine's

---

[4] Defendants dispute that Synopsys "effectively" controls access to its software, arguing that Synopsys could have used call-home software to send "revoke" messages disabling access once a counterfeit license is detected.  As explained in Synopsys' opposition to Defendants' summary judgment motion (ECF No. 298-4 at 6-7), Defendants' argument is wrong as a matter of law under *MDY Indus.*  The FlexNet license checkout software is an access control because (1) Synopsys' keys provide "authorization information"; (2) in the normal course of its operation, FlexNet requires the application of that "authorization information" to gain access to Synopsys software; and (3) if the FlexNet check does not find the correct authorization information during the license check out process, the applications terminate and cannot be run.  *MDY Indus.*, 629 F.3d at 954 (To ""effectively control access to a work," a technological measure must "in the ordinary course of its operation, require[ ] the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work.").

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 4 -

PLAINTIFF SYNOPSYS, INC.'S MOTION TO
EXCLUDE EXPERT TESTIMONY
3:17-cv-00561-WHO

1  "invocations" estimate is based on hypothetical scenarios under which Defendants might have

2  used scripts to automate launching of multiple applications with a single command ("might"

3  because Defendants' spoliation destroyed the evidence of whether Defendants actually used the

4  scripts about which Stubblebine speculates).  By design, Stubblebine's invocation analysis seeks

5  to minimize Defendants' misconduct by grouping distinct acts of circumventions together as one

6  "invocation."  Such analysis is not related to the pertinent inquiry under the DMCA.

7          For example, according to Stubblebine, *if* a Ubiquiti employee used one script that caused

8  five separate applications to execute, that should only be counted as a single "invocation" because

9  the user only entered one command on his keyboard. Ex. 6 (Stubblebine Dep.) at 227:20-228:7;

10  234:13-235:20.  To use Stubblebine's argument in a familiar setting, Stubblebine argues that if a

11  user wrote a script that launched Microsoft Outlook, Microsoft Word, Microsoft PowerPoint,

12  Microsoft Excel, and Microsoft Internet Explorer with the push of one button, running that script

13  should only count as one "invocation" of Microsoft software, even if each one of those five

14  Microsoft programs had its own security measure that had to be separately bypassed to access that

15  individual program. Ex. 6 (Stubblebine Dep.) at 254:20-255:14.  As the example demonstrates,

16  Stubblebine's "invocations" opinion has nothing to do with proper analysis under the DMCA.

17  What matters for purposes of the DMCA is the number of circumventions, not the number of key

18  strokes used to "invoke" software.  *See, e.g., MDY Indus.*, 629 F.3d at 946 (DMCA is violated by

19  the act of "circumvention itself."); *Point 4 Data Corp.*, 2012 U.S. Dist. LEXIS 113791, at *40

20  (holding that each user login to system was a separate act of circumvention, rejecting defense

21  argument that they only implemented "Crack" one time to unlock the software and then used it

22  thereafter with impunity because the security measure had been bypassed once already);

23  *Stockwire Research Group, Inc.,* 577 F. Supp. 2d at 1268 n.10 (focusing on number of times

24  circumvention technology was used); *Reeves,* 2010 U.S. Dist. LEXIS 85560, at *5 (same); *see

25  also Disney Enters. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 967 (C.D. Cal. 2016) (DMCA

26  violations could be caused by software designed to "automatically allow read-access" for

27  encrypted DVDs).

28          That Stubblebine's opinion strays so far from the dictates of the DMCA likely explains

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 5 -

PLAINTIFF SYNOPSYS, INC.'S MOTION TO
EXCLUDE EXPERT TESTIMONY
3:17-CV-00561-WHO

1   why he is the only witness in this case who uses such an "invocations" framework to group

2   circumventions together.  Tellingly, Defendants' EDA expert, Voin Oklobdjiza, would count five

3   invocations of Microsoft software in the above scenario.  Ex. 7 (Oklobdjiza Dep.) at 247:20-

4   248:9; 262:15-24.  If Defendants' own experts can't even keep their stories straight about what

5   "invocations" means, the jury won't be able to either.  *Daubert* does not permit to confuse the

6   jury with an irrelevant and manufactured apples to donuts comparison that is divorced from the

7   text of the DMCA.  *Accord* Fed. R. Evid. 403.

8       **C.**     **Stubblebine's Invocations Analysis Fails the *Daubert* Reliability Test**

9       Rule 702 requires courts to determine "whether [expert] findings are 'derived by the

10  scientific method,' and whether [expert] work product amounts to 'good science.'"  *Daubert v.*

11  *Merrell Dow Pharms.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*").  "Establishing that an

12  expert's proffered testimony grows out of pre-litigation research or that the expert's research has

13  been subjected to peer review are the two principal ways the proponent of expert testimony can

14  show that the evidence satisfies the [reliability] prong of Rule 702."  *Id.* at 1318.  Absent such

15  evidence, "experts must explain precisely how they went about reaching their conclusions and

16  point to some objective source … to show that they have followed the scientific method."  *Id.* at

17  1319.

18      Stubblebine's "invocations" opinion does not grow out of Stubblebine's pre-litigation

19  research, as Stubblebine is not an EDA expert.  Stubblebine Depo. at 18:23-19:15.  The term

20  "invocations" has no universally accepted meaning in the computer science context.  Ex. 1

21  (Edwards Rebuttal) ¶ 49; *see also* Oxford Dictionary of Computer Science, 7th ed. (no definition

22  for "invoke" or "invocation").  Stubblebine simply made up the "invocations" concept discussed

23  in his report for the specific purpose of analyzing the Synopsys call-home data in this case.  Ex. 6

24  (Stubblebine Dep.) at 255:6-8 ("My notion of invocation was particular to the [] call home

25  records"); 244:6-245:4 ("This invocation analysis was with respect to call home [data]"); 245:8-

26  12 (Q:… "does your concept of invocations differ depending on what application we're

27  discussing?" A: "The story here, this whole aspect here was based on looking at the call home

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 6 -

PLAINTIFF SYNOPSYS, INC.'S MOTION TO
EXCLUDE EXPERT TESTIMONY
3:17-CV-00561-WHO

1    data…"); 246:20-23 ("invocation has a context…defined by what is going on, what we see in the

2    call home records").

3         Because Stubblebine's invocations opinion does not arise from pre-litigation research and

4    has not been subjected to peer review, Stubblebine "must explain *precisely* how [he] went about

5    reaching [his] conclusions.  *Daubert II,* 43 F.3d at 1319 (emphasis added).  Stubblebine must also

6    "point to some objective source—a learned treatise, the policy statement of a professional

7    association, a published article in a reputable scientific journal or the like—to show that [he]

8    followed the scientific method."  *Id.*  Stubblebine can do neither.

9         **1.    <u>Stubblebine's "invocations" analysis is not supported by any legitimate</u>

10   <u>methodology</u>**

11        Statistical analysis is the type of expert opinion that must be supported by sufficient

12   scientific methodology in order to be admissible.  *Daubert II,* 43 F.3d at 1320 (applying *Daubert*

13   test to statistical evidence); *United States v. Williams,* No. 3:13-cr-00764-WHO, 2017 U.S. Dist.

14   LEXIS 129944, at *39 (N.D. Cal. Aug. 15, 2017) (noting that "judicial vigilance" is required and

15   that "[n]umerous hazards attend the courtroom presentation of statistical evidence of any sort")

16   (citation omitted).  Proper application of scientific methods "is a necessary component of

17   ensuring the reliability of the opinion testimony," and the "basis for an expert's opinion must

18   necessarily entail how he employed his methodology; that consideration is critical to a

19   determination of whether the opinion 'rests on a reliable foundation.'"  *Id*. at *35-36 (citing

20   *Daubert,* 509 U.S. at 597).

21        Here, Stubblebine is miles away from being able to "explain precisely" the statistical

22   methodology he used to formulate his invocations opinion, because he didn't use one.  *Contra*

23   *Daubert II,* 43 F.3d at 1319.  Stubblebine describes his "methodology" by saying that he looked

24   at histograms of the call-home data—which is just a fancy way of saying he looked at the number

25   of circumventions that Defendants were guilty of and then grouped them together based on time

26   intervals that seemed subjectively reasonable to Stubblebine.  Stubblebine's *ad hoc* time-intervals

27   are not tied to any verifiable standard.

28        Stubblebine used a 60-second interval in assessing executions of VCS applications, a 60-

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 7 -

PLAINTIFF SYNOPSYS, INC.'S MOTION TO
EXCLUDE EXPERT TESTIMONY
3:17-CV-00561-WHO

second interval in assessing executions of Verdi applications, a 10-second interval in assessing

executions of Design Compiler applications, and *no* temporal intervals in assessing executions of

the other Synopsys applications in this case.  Why Stubblebine chose a 60-second interval for

some applications, a 10-second interval for other applications, and no time intervals at all for the

balance of the applications is anyone's guess.  Stubblebine's proffered reason for choosing a 60-

second interval for grouping together VCS circumventions is set forth in paragraph 180 of his

opening report:

> 180.  As displayed in the following histograms, there is timing behavior
> **supportive of automation rather than manual invocations of individual**
> **binaries**, though it is difficult if not impossible to determine with absolute
> certainty how many invocations are associated with manual or automated
> invocations due to the limitations of the call-home data.  The histograms indicate
> that many sub-sequences occur within sixty seconds of one another.  This interval
> appears reasonable with respect to the consistency factors discussed later.
> **Increasing the time window could discover additional sequences and result in**
> **a lower total number of individual invocations, whereas reducing the period**
> **would increase the number of individual invocations, so I chose a measure of**
> **sixty seconds.  However, other intervals may also be reasonable**.

Ex. 4 (Stubblebine Report) ¶ 180 (emphasis added).  What Stubblebine describes in paragraph

180 is not the application of scientific methodology.  Rather, paragraph 180 shows that

Stubblebine approached his analysis of the call-home data histograms from the perspective of his

foregone conclusion that Defendants automated their use of Synopsys software.  Having

concluded from the outset that Defendants' circumventions should be grouped together as sets of

automated "invocations," Stubblebine then arbitrarily chose a time interval that he subjectively

believed resulted in a "reasonable and conservative estimate" of the number of invocations.  *Id*.

¶ 187.  Stubblebine's subjective, results-driven analysis "necessarily biased his conclusions,"

because his "subjective determinations are ingrained in the statistical interpretation that generates

the conclusion."  *Williams*, 2017 U.S. Dist. LEXIS 129944, at *28.

Stubblebine's grouping of Design Compiler circumventions suffers from the same

problems.  In explaining his chosen 10-second interval for Design Compiler, Stubblebine's report

states:

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 8 -

PLAINTIFF SYNOPSYS, INC.'S MOTION TO
EXCLUDE EXPERT TESTIMONY
3:17-cv-00561-WHO

182.  Using a similar methodology, I used a time window of ten seconds for Design Compiler.  The following histogram of Design Compiler sequences shows that many Design Compiler sequences were spaced ten seconds or less apart ....  The histogram indicates that many sub-sequences occur within ten seconds of one another.  This interval appears reasonable with respect to the consistency factors discussed later.  **Increasing the time window could discover additional sequences and result in a lower total number of individual invocations, whereas reducing the period would increase the number of individual invocations, so I chose a measure of ten seconds.  However, other intervals may also be reasonable**.

Ex. 4 (Stubblebine Report) ¶ 182 (emphasis added).

Importantly, Stubblebine's concession that "other intervals may also be reasonable" is tantamount to an admission that "someone else using the same data and methods" might not be able to replicate Stubblebine's results.  *Williams*, 2017 U.S. Dist. LEXIS 129944, at *30.  Stubblebine's failure to explain why he arbitrarily relied on his chosen time intervals in the face of other reasonable alternatives demonstrates that Stubblebine's methodology was anything but scientific.  *See id.; see also FTC v. Wellness Support Network, Inc*., No, 10-cv-04879-JCS, 2013 U.S. Dist. LEXIS 144140, at *34 (N.D. Cal. Oct. 4, 2013) ("*Daubert* requires that Dr. Charles address alternative explanations …").

### 2. Stubblebine's opinions are not based on sufficient data

Expert opinion that relies on extrapolations drawn from data should be excluded where there is "too great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Here, Stubblebine's own report leaves no doubt about the gap between Synopsys' call-home data and Stubblebine's speculative invocations opinion.  Stubblebine states unequivocally in paragraph 25 of his report that "the number of entries in the Synopsys call-home data (SNPS0000001) *is unreliable* as a measure of the exact *or even approximate* number of invocations of Synopsys EDA tools" (emphasis added), and Stubblebine repeats this assertion in his opening report at least a dozen other times.  *See, e.g.,* Ex. 4 (Stubblebine Report) ¶ 134 (nature of Synopsys software "prevents call-home data from being used as an accurate proxy for the number of invocations of Synopsys EDA tools").[5]

---

[5] *See also* Ex. 4 (Stubblebine Report) ¶ 127 ("It is my opinion that the call-home data is unreliable as a basis for counting the precise number of invocations of Synopsys EDA tools."); ¶ 128 (similar), ¶ 133 (similar), ¶ 145 ("it is impossible to determine the number of actual invocations…based on the call-home data"); ¶ 151 (same); ¶ 162 (same); ¶ 170 (same); ¶ 185

1    Yet despite his conclusion that Synopsys call-home data does not provide a reliable basis

2    for even *estimating* the number of Stubblebine-defined "invocations," Stubblebine relied on the

3    call-home data to do just that.  Stubblebine's reliance on call home data to measure "invocations,"

4    despite his belief that the call-home data "is unreliable as a measure of the exact or even

5    approximate number of invocations of Synopsys EDA tools," is not a proper application of the

6    scientific method under any stretch of the imagination.  *See, e.g., In re Countrywide Fin. Corp.*

7    *Mortgage-Backed Secs. Litig.,* 984 F. Supp. 2d 1021, 1027 (C.D. Cal. 2013) (Rule 702 requires

8    experts to "reliably apply scientific methods to sufficient data").  No reasonable scientist would

9    base a conclusion on data they deemed unreliable to support their conclusion.  Stubblebine's

10   invocations opinion is a textbook example of an opinion "connected to existing data only by the

11   *ipse dixit* of the expert" that should be excluded.  *Joiner*, 522 U.S. at 146.

12       In attempting to close the analytical gap between the call-home data and Stubblebine's

13   invocations concept, Stubblebine—who is not an EDA expert and has no significant experience

14   using Synopsys EDA tools—purports to rely on defense expert Voin Oklobdjiza's discussion of

15   how Synopsys' applications can be "invoked."  But critically, Dr. Oklobdjiza *does not* agree with

16   Stubblebine's concept of "invocation."  Rather, Oklobdjiza testified that if a user enters one

17   command that causes two separate applications to execute, that should be counted as two

18   "invocations"—which is directly contrary to what Stubblebine argues.  Ex. 7 (Oklobdjiza Dep.) at

19   247:20-248:9.  Moreover, Oklobdjiza agrees that the number of "circumventions" is the number

20   of times Synopsys EDA applications were unlawfully accessed without a license, not the number

21   of times a user entered a script or command.  Ex. 7 (Oklobdjiza Dep.) at 245:21-246:1; 262:12-

22   263:19.

23       **3.    Stubblebine's analysis is not testable or subject to repetition**

24       "In order for a scientific technique to be reliable, there must be evidence in the record

25   indicating the methodology 'can be or has been tested.'"  *City of Pomona v. SQM N. Am. Corp.,*

26   750 F.3d 1036, 1046 (9th Cir. 2014) (citing *Cooper v. Brown*, 510 F.3d 870, 880-81 (9th Cir.

27   (same); ¶ 188 ("the call-home data…is unreliable on its face"); ¶ 201 ("it is my opinion that the
     data cannot be trusted as a whole, and certainly not as a concrete measure of the number of
28   alleged unauthorized invocations of Synopsys EDA tools").

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 10 -

PLAINTIFF SYNOPSYS, INC.'S MOTION TO
EXCLUDE EXPERT TESTIMONY
3:17-CV-00561-WHO

2007)).  By design, Stubblebine's subjective "invocations" concept defies testing, because it is not tethered to any firm definition or objective criteria.  Stubblebine's Rule 26(a)(2)(B) reports conspicuously fail to define the term "invocation," and Stubblebine uses the term inconsistently throughout his reports.  *See* Ex. 1 (Edwards Rebuttal) ¶¶ 49-57.  During his deposition, Stubblebine was unable to provide an objective definition of his "invocations" concept; he testified that "the meaning may be slightly different based on the context" and suggested that how he used the term "invocation" in his report would have to be evaluated on a paragraph-by-paragraph basis.  Ex. 6 (Stubblebine Dep.) at 220:19-20; 226:18-24.  An expert's "subjective, conclusory approach that cannot reasonably be assessed for reliability" must be excluded.  *City of Pomona,* 750 F.3d at 1046; *Halcomb v. Wash. Metro. Area Transit Auth.,* 526 F. Supp. 2d 24, 30 (D.D.C. 2007) ("Rule 702 also precludes Mr. Mamet from offering opinion testimony based on personal opinions rather than on relevant objective standards").

The subjective nature of Stubblebine's invocations concept is demonstrated by the fact that Stubblebine's justification for grouping multiple circumventions into one "invocation" changes from application to application.  For example, Stubblebine opines that Defendants' use of four separate counterfeit license keys to run four separate applications within the VCS product suite (vcs1, vcselab, simv, and dve) should be grouped together because Synopsys "provid[es] example makefiles and scripts" that could be configured so that a single VCS shell script command could result in "multiple invocations of vcs1, vcselab, simv, dve.exe, and other binaries."  Ex. 4 (Stubblebine Report) ¶¶ 136, 138.  But Stubblebine abandons his "Synopsys-provided-example-script" rationale in order to group Synopsys' Verdi application with VCS, arguing that certain of Defendants' executions of Verdi and VCS (two entirely different products) should be grouped together because Defendants *could have* created *their own* script to invoke both VCS and Verdi.  *Id.* ¶ 163.  Of course, whether Defendants *actually* created a VCS-Verdi script is pure speculation, because Stubblebine conspicuously decided not to ask Defendants if they had done so.  "An expert who fails to review relevant data, and can offer no good reason for it … has not reliably applied a scientific methodology."  *Moore v. Napolitano*, 926 F. Supp. 2d 8, 24 (D.D.C. 2013); *Paul Revere Life Ins. Co. v. Jafari*, No. MJG-00-2705, 2002 U.S. Dist. LEXIS

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 11 -

PLAINTIFF SYNOPSYS, INC.'S MOTION TO
EXCLUDE EXPERT TESTIMONY
3:17-CV-00561-WHO

28224, at *18 (D. Md. Sept. 19, 2002) (excluding testimony where expert did "not take steps, readily available, to conduct a more valid, and potentially verifiable examination").

Stubblebine takes a third approach when grouping Design Compiler executions together as a single invocation. Stubblebine observed what he refers to as "short time spans" between call-home entries for Design Compiler, which Stubblebine avers "supports [sic] the conclusion that Design Compiler is automatically running iteratively." Ex. 4 (Stubblebine Report) ¶ 172. Stubblebine therefore decided to group Design Compiler executions together, even though he concedes that such grouping "does not comport with the way in which Synopsys has designed Design Compiler to be invoked." *Id.* In other words, whereas Stubblebine grouped VCS executions together because he thinks such grouping is consistent with how VCS was designed to be used, he grouped Design Compiler executions together even though he thinks such groupings *are not* consistent with how Design Compiler is designed to be used. There is simply no consistent rationale for Stubblebine's groupings. As such, Stubblebine's shape-shifting invocations concept was not, and cannot be, consistently applied. *Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 12cv7096, 2015 U.S. Dist. LEXIS 108320, at *26 (S.D.N.Y. Aug. 17, 2015) (rejecting data where proffering party failed to show that methodology underlying data was consistently applied); *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 518 (W.D. Pa. 2003) (similar); *Southern Star Cent. Gas Pipeline, Inc. v. 120 Acres Located in Rice Cty.*, No. 09-2435-EFM-GLR, 2012 U.S. Dist. LEXIS 38622, at *13 (D. Kan. Mar. 22, 2012) (similar).

### D. Defendants' Invocations Argument Seeks to Profit from Defendants' Spoliation and Withholding of Evidence

Stubblebine's invocations analysis should be excluded for the independent reason that it is a blatant attempt to profit from Defendants' spoliation of evidence. *See, e.g., Bruno v. Bozzuto's, Inc.,* 311 F.R.D. 124, 137 (M.D. Pa. 2015) (granting *Daubert* motion based on expert's "use of unreliable and unverified inputs necessitated by Plaintiffs' initial spoliation of their financial data."); *Innis Arden Golf Club v. Pitney Bowes, Inc.,* 629 F. Supp. 2d 175, 190 (D. Conn. 2009) (excluding expert testimony under *Daubert* where spoliation prevented validation of expert opinion); *see also Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 442-43

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 12 -

PLAINTIFF SYNOPSYS, INC.'S MOTION TO
EXCLUDE EXPERT TESTIMONY
3:17-CV-00561-WHO

1   (S.D.N.Y. 2009) (precluding spoliator "from challenging any statistical evidence of infringement"

2   on fairness grounds); *compare Stephenson v. Caterpillar Inc.*, No. 2:16-CV-00071-JRG, 2018

3   U.S. Dist. LEXIS 201628, at *15 (E.D. Tex. Oct. 30, 2018) (noting prejudice to expert analysis

4   caused by loss of evidence but permitting testimony because spoliation was not intentional).

5        As explained more fully in Synopsys' motion for sanctions, Defendants destroyed the

6   command logs, scripts, makefiles, and other artifacts that would have definitively shown how

7   Defendants were using Synopsys' software.  ECF No. 242-2.  The evidence Defendants destroyed

8   was the *only* evidence that would have allowed Synopsys to test Stubblebine's invocations

9   opinion.  Ex. 2 (Salz 11/9/2018 Dep.) at 485:11-17; ECF No. 241-1; Roffman Decl. ¶¶ 22-25.  To

10   permit Stubblebine to offer his speculative opinions on invocations after Defendants deprived

11   Synopsys of the evidence needed to rebut Stubblebine's opinions would compound the prejudice

12   to Synopsys caused by Defendants' spoliation.  This prejudice would be particularly acute given

13   that Stubblebine's "invocations" concept has no probative value with respect to Defendants'

14   number of circumventions and would simply confuse the jury with "untrustworthy results."

15   *Williams*, 2017 U.S. Dist. LEXIS 129944, at *39 (applying Fed. R. Evid. 403 and quoting

16   *Daubert* for the proposition that "[e]xpert evidence can be both powerful and quite misleading

17   because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible

18   prejudice against probative force under Rule 403 of the present rules exercises more control over

19   experts than over lay witnesses.").

20   ## III.    FOX'S BUSINESS JUDGMENT RULE OPINION SHOULD BE EXCLUDED

21        Fox's opinion that Ubiquiti/UNIL's alleged efforts to enforce the Ubiquiti Code of

22   Business Conduct and Ethics (the "Ubiquiti Ethics Policy") were proper under the business

23   judgment rule fail under *Daubert* because the business judgment rule is legally irrelevant to the

24   issues in this case.  The business judgment rule only limits the liability of a corporation's

25   directors in a shareholder's derivative suit and does not apply to claims by third-party corporate

26   outsiders, such as Synopsys.  In addition, Synopsys has not alleged that Ubiquiti/UNIL's

27   directors breached their duties to the corporations or might be liable in a shareholder's derivative

28   suit, which are the only issues to which Fox's opinions about the business judgment rule might

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 13 -

PLAINTIFF SYNOPSYS, INC.'S MOTION TO
EXCLUDE EXPERT TESTIMONY
3:17-CV-00561-WHO

1  be relevant.

2        **A.**    <u>**Factual Background**</u>

3        Ubiquiti/UNIL have taken the position that they cannot be held liable for their

4  employees' misconduct because the employees violated the Ubiquiti Ethics Policy.  In this case,

5  the Ubiquiti Ethics Policy is no defense to respondeat superior liability in this case, both based

6  on the facts of this case and the applicable law as to Synopsys' DMCA and state law claims.  *See*

7  Pl.'s MSJ at 13-18 (ECF No. 250-4).  If the Court believes there is a fact issue on respondeat

8  superior, however, Synopsys may present its expert William Hasler to testify about the way

9  corporations enforce their ethics policies and investigate and prevent employee misconduct.  *See*

10  Ex. 8 (Hasler Report) at 11-36; Ex. 9 (Hasler Dep.) at 91:23-92:17, 123:1-25.

11        Ubiquiti/UNIL have offered Fox as a rebuttal expert to Hasler.  In his expert report, Fox

12  opines—and Synopsys agrees—that the question of whether Ubiquiti/UNIL adequately enforced

13  the Ubiquiti Ethics Policy "is an issue that relates to agency law, not to corporate law and

14  governance."  *See* Ex. 10 (Fox Rebuttal Report) at 3.  Having just said that the issue is governed

15  by *agency law*, not corporate law and governance, Fox then criticizes Hasler's analysis for

16  ignoring the impact of the business judgment rule, even though Hasler offers no opinions on the

17  directors' duty of care.  *See id.* at 6 ("There is a huge omission in Mr. Hasler's discussion of the

18  duty of care and its application to the actions of Ubiquiti's officers and directors: he neglects to

19  mention the business judgment rule.").  Fox then affirmatively asserts that Ubiquiti/UNIL's

20  actions might be proper under the business judgment rule because they may have benefitted the

21  corporation's shareholders, ignoring his own  (undisputed) conclusion that agency law, not

22  corporate governance law, governs Ubiquiti/UNIL's liability.  *See, e.g.*, *id.* at 8 ("The record that

23  I have reviewed simply does not support the conclusion that Ubiquiti's enforcement of the Code

24  or its investigation of the ITCA and Synopsys infringement claims involved totally flawed

25  procedures or decisions by its directors and officers self-evidently contrary to the best interests of

26  Ubiquiti's shareholders."); *id.* at 7 ("There is nothing in the record or in the Hasler Report to

27  suggest that Ubiquiti's three independent directors had any personal conflict of interest with

28  respect to any of their actions at issue here.").

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 14 -

PLAINTIFF SYNOPSYS, INC.'S MOTION TO
EXCLUDE EXPERT TESTIMONY
3:17-CV-00561-WHO

**B.**     **The Business Judgment Rule Does Not Apply to Suits by Corporate Outsiders**

Opinions based on an incorrect view of the law should be excluded. *See Villalpando v. Exel Direct, Inc.*, 161 F. Supp. 3d 873, 895 (N.D. Cal. 2016) ("[A]n expert's reliance on *incorrect* legal assumptions would warrant exclusion ...."); *Kumho Tire*, 526 U.S. at 149 (expert testimony must be relevant to the "pertinent inquiry").  Fox's opinions relating to the business judgment rule should be excluded because the rule does not apply to suits by corporate outsiders like Synopsys.

The business judgment rule shields the directors of a corporation from personal liability for actions involving the operation of the corporation.  Cal. Corp. Code § 309; *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1374 (Del. 1995).  The rule does not affect the corporation's liability to third parties.  *See, e.g.*, *In re Colony Beach & Tennis Club Ass'n, Inc.*, 456 B.R. 545, 559 (M.D. Fla. 2011) ("The business judgment rule does not empower a corporation to escape the consequences of the corporation's actions toward the outside world."); *McKnight v. Midwest Eye Inst. of Kansas City, Inc.*, 799 S.W.2d 909, 913 (Mo. Ct. App. 1990) (the business judgment rule does not relieve a corporation of its legal obligations).  Indeed, even Fox acknowledged that the business judgment rule does not apply to claims by third parties:

> Q.  You're not aware of any authority for the proposition that the business judgment rule applies in cases brought against a corporation by a third party for violations of the DMCA, for example?
>
> A.  I'm not aware of any cases that apply the duty—find a violation of the duty of care in that connection.  So because of that, I'm not aware of any that apply the business judgment rule.

Ex. 11 (Fox Dep.) at 77:15-22; *see also id.* at 77:23-78:5, 79:1-9.  Therefore, Fox's opinions should be excluded because they are premised on a legal doctrine that does not apply to this case.

**C.**     **It Is Undisputed That Ubiquiti/UNIL's Liability Is Governed by Principles of Agency Law**

Expert opinions on matters that are not at issue in the case should be excluded because they are irrelevant.  *See Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." (quotations omitted)); *DCS Mktg., Inc. v. Homer Laughlin China Co.*, No. SA CV 09-144 DOC (MLGx), 2009 WL 10674051, at *4

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 15 -

PLAINTIFF SYNOPSYS, INC.'S MOTION TO
EXCLUDE EXPERT TESTIMONY
3:17-cv-00561-WHO

1    (C.D. Cal. Nov. 5, 2009) ("[W]hether an opinion the expert is proffering relates to a disputed

2    issue goes to whether opinion the expert offers helps the trier of fact."). Expert opinions that are

3    irrelevant should also be excluded under Rule 403 because they can confuse the jury. *See United*

4    *States v. Scholl*, 166 F.3d 964, 971 (9th Cir. 1999) (when there is "no fit between [the expert's]

5    testimony and the issue" on which the expert is offered, the opinion is "confusing, inconsistent,

6    and misleading under Rule 403" (quotations omitted)).

7         Even Fox acknowledges that Ubiquiti/UNIL's liability for the acts of their employees "is

8    an issue that relates to agency law, not to corporate law and governance." Fox Report at 3.

9    Likewise, Synopsys' expert, Hasler, has stated unequivocally that he is not offering any opinions

10   about whether Ubiquiti/UNIL's directors violated their fiduciary duties to the corporations or

11   could be liable in a shareholder's derivative suit. Ex. 9 (Hasler Dep.) at 82:11-83:12. Thus,

12   Hasler is not offering an opinion on the directors' fiduciary duties to the corporations for Fox to

13   rebut and the parties agree that corporate governance law is not relevant to Ubiquiti/UNIL's

14   liability. Fox's opinions on the fiduciary duties of Ubiquiti/UNIL's directors and the business

15   judgment rule are therefore irrelevant and should be excluded.

16   **IV.   KENNEDY'S LEGAL OPINIONS ABOUT DOUBLE RECOVERY SHOULD BE**
     **EXCLUDED**

17

18        Kennedy intends to testify that Synopsys cannot recover damages for all of its claims

19   because doing so would give it a prohibited double recovery. The applicability of the double

20   recovery rule is a purely legal issue on which expert testimony would be improper. Moreover,

21   double recovery issues will only arise after the verdict, and the jury should not be asked to

22   resolve double-recovery issues themselves.

23        **A.     Factual Background**

24        Kennedy asserts that "[e]ven where damages are based on separate statutes or causes of

25   action, it is my understanding that there may only be one recovery." Ex. 12 (Kennedy Report) at

26   6 & nn.30-32 (citing cases). Although Kennedy supports this opinion with a few cases that were

27   provided to him by counsel, Kennedy did not even read them. *See id.*; Ex. 13 (Kennedy Dep.) at

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 16 -

PLAINTIFF SYNOPSYS, INC.'S MOTION TO
EXCLUDE EXPERT TESTIMONY
3:17-CV-00561-WHO

72:15-24.  More to the point, Kennedy testified that he intends to expound on the double

recovery rule to the jury.  Ex. 13 (Kennedy Dep.) at 67:20-68:4.

**B.      Kennedy's Opinions on the Double-Recovery Rule Should Be Excluded Because They Are Legal Opinions**

Whether the double-recovery rule applies in a given case is a question of law.  *See Uthe*

*Tech. Corp. v. Aetrium, Inc.*, 808 F.3d 755, 760-62 (9th Cir. 2015) (analyzing double recovery

under RICO as a legal issue).  Kennedy has testified that he intends to tell the jury that they

should not award Synopsys a double recovery in this case.  Ex. 13 (Kennedy Dep.) at 67:25-68:4

("I will tell the jury these are royalties for these sales, these are lost profits for these sales and

they don't—you don't get both from a damages calculation.").  It is well-settled, however, that

experts may not give opinions on legal issues because instructing the jury on the law is the

exclusive province of the judge.  *See, e.g.*, *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523

F.3d 1051, 1058 (9th Cir. 2008) ("[A]n expert witness cannot give an opinion as to her *legal*

*conclusion*, i.e., an opinion on an ultimate issue of law.  Similarly, instructing the jury as to the

applicable law is the distinct and exclusive province of the court.") (quotations omitted);

*Villalpando*, 161 F. Supp. 3d at 895 ("It is well-established that expert testimony is not proper

for issues of law.") (quotations and alterations omitted)); *DCS Mktg.*, 2009 WL 10674051, at *3

("Allowing an expert to give opinions as to legal conclusions invades the province of the trial

judge.").

In addition, the double recovery rule should normally be applied after the jury returns a

verdict, and the judge, not the jury, should determine whether an award of damages for different

claims would result in an impermissible double recovery.  For example, *Aero Products*

*International, Inc. v. Intex Recreation Corp.*, 466 F.3d 1000, 1017 (Fed. Cir. 2007), which

Kennedy relies on extensively, held that "the law is clear that the jury may award separate

damages for each claim, leaving it to the judge to make appropriate adjustments to avoid double

recovery." (quotations and alterations omitted); *see also Britton v. Maloney*, 196 F.3d 24, 32 (1st

Cir. 1999) (holding that it was reversible error to instruct the jury "the plaintiff is not entitled to

double recovery" and that they should not award damages for both the plaintiff's § 1983 and

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 17 -

PLAINTIFF SYNOPSYS, INC.'S MOTION TO
EXCLUDE EXPERT TESTIMONY
3:17-CV-00561-WHO

1   common law claims).[6]  There is simply no reason to introduce expert testimony on the double

2   recovery rule.

3   **V.      CONCLUSION**

4          For the foregoing reasons, Synopsys respectfully requests that the Court exclude:

5   (1) Stubblebine's invocations opinions; (2) Fox's business judgment opinions; and (3)

6   Kennedy's double recovery rule opinions.

7   Dated: December 19, 2018                    DENISE M. MINGRONE
                                                 CLAUDIA WILSON FROST
8                                               ROBERT L. URIARTE
                                                 ORRICK, HERRINGTON & SUTCLIFFE LLP
9

10

11                                              By: */s/ Denise M. Mingrone*
                                                     DENISE M. MINGRONE
12
                                                 Attorneys for Plaintiff
13                                              SYNOPSYS, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27   ───────────────────────
     [6] In a case such as this with multiple liability theories and damages models, the jury should be
28   instructed to award damages separately for each claim and that "[t]he court will insure that there
     is no double recovery."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 451 n.3 (1993).

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4137-9538-1017

- 18 -

PLAINTIFF SYNOPSYS, INC.'S MOTION TO
EXCLUDE EXPERT TESTIMONY
3:17-CV-00561-WHO